Richard W. HUBBARD, Delaware Securities Commissioner, Defendant Below, Appellant/Cross–Appellee

v.

HIBBARD BROWN & CO., Brendon D. Hart and Michael Martone, Plaintiffs Below, Appellees/Cross–Appellants.

Supreme Court of Delaware.

Submitted: Sept. 8, 1993.
Decided: Nov. 22, 1993.

W. Michael Tupman (argued), Dept. of Justice of State of Del., for appellant/cross-appellee.

Joseph A. Rosenthal (argued), Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, for appellees/cross-appellants.

Before VEASEY, C.J., WALSH and HOLLAND, JJ.

VEASEY, Chief Justice:

This is an appeal and cross-appeal from a decision of the Court of Chancery modifying an order entered by Richard W. Hubbard, the Securities Commissioner of the State of Delaware (the "Commissioner"), imposing sanctions against Hibbard Brown & Company, Inc. ("Hibbard Brown"), a broker-dealer registered to sell securities in the state of Delaware, and two of its agents, Michael Martone ("Martone") and Brendon D. Hart ("Hart"). In reviewing the Court of Chancery's decision, we must examine the standards and appropriate sanctions for violations of 6 Del.C. § 7303, which sets forth the antifraud provisions of the Delaware Securities Act. At issue is the conduct of Hibbard Brown, Martone, and Hart in recommending and selling certain securities to several Delaware citizens. We conclude that the Court of Chancery properly exercised its discretion when it modified the sanctions imposed by

the Commissioner against Hibbard Brown because there was insufficient evidence that Hibbard Brown's management was directly involved in the fraud. The Court of Chancery was also correct in upholding the Commissioner's award of restitutionary damages to the injured investors and the revocation of the licenses of Martone and Hart. These portions of the Court of Chancery's opinion are therefore AFFIRMED. We further hold, however, that the Court of Chancery committed an error of law when it determined the adequacy of Hibbard Brown's disclosure of its market maker status based on the lack of sophistication of the actual investors involved rather than from the standpoint of a reasonable investor. We therefore REVERSE that portion of the Vice Chancellor's decision and REMAND the matter for further proceedings consistent with this opinion.

## I. FACTS

The principal focus of the Commissioner's proceeding was the actions of Martone and Hart in recommending the sale of a number of highly risky and speculative securities to Roy Krieger ("Krieger") and John H. Flynn, IV ("Flynn"), both Delaware residents who have little knowledge or experience in buying stocks. In 1989 and 1990 Krieger was a pipe-fitter at the DuPont Experimental Station making approximately $34,000 per year. He had a high school education and had never previously bought stock or bonds except for some DuPont stock through the company's thrift plan. Flynn was employed by the DuPont Company as a chemist and had an annual income of approximately $60,000. His wife had an equivalent salary and their net worth was approximately $250,000. Flynn also had limited experience in purchasing securities though he had bought stock in a chemical company other than DuPont and had invested in some mutual funds and a limited partnership.

During 1989 Martone first contacted Krieger by calling him at work. Even though Krieger initially indicated he was not interested in buying stocks, Martone called

him back several times. After meeting with Martone, Krieger evidently changed his mind. Krieger had $50,000 from the sale of a residence and wanted a higher rate of return than that obtainable at banks. Krieger first bought some shares of Children's Creative Workshop, Ltd. based on Martone's advice that "it was a good company coming up and there were a lot of good things happening within the company that he couldn't tell [Krieger] at that time." According to Krieger, Martone stressed that there was "no downside risk."[1] The Commissioner found that "Children's Creative was a highly risky security with little to recommend it, and Martone's recommendation was unreasonable and made in bad faith."

Krieger purchased a number of additional stocks based on Martone's recommendation. These stocks were similarly risky being "low-end" NASDAQ stocks with little liquidity. After making some "paper profits," Krieger learned a little about the stock market. He started growing suspicious of Martone and began tape recording their conversations. The Commissioner found these tapes showed that Martone was aware of and encouraged Krieger's confusion about, the market and his reliance on Martone. By the time Krieger's investments were liquidated, he and his wife had lost $21,721.85 of the $22,820.50 they had invested.

At the time he was first contacted by Hart, Flynn was uncertain about his job status and was preparing for retirement in about eight years. Flynn therefore could not risk a substantial loss of principal. The Commissioner found that "Hart dishonestly recorded Flynn's investment objective on the new account form as 'speculation' when it was not." Hart recommended that Flynn buy shares in Trans–Atlantic Video, an extremely speculative investment, according to the Commissioner. While Hart gave Flynn a prospectus and stated Hibbard Brown's standard disclaimer about all stocks having risks, Hart did not point out the particular risks of Trans–Atlantic.

---

**1.** Martone denies saying that there was no downside risk, but the Commissioner rejected his testimony.

The Commissioner found that Flynn bought Trans–Atlantic and other speculative stocks relying on Hart's recommendations. When asked about the liquidity of the stocks, Hart assured Flynn that it was not a concern despite the fact that the stocks had a very limited market. The Commissioner also noted that Hart deceived Flynn regarding the value of his portfolio, including the extent of his losses. By the time Flynn's shares were sold, he and his wife had lost $26,237 of the $37,253 invested.

The proceeding before the Commissioner involved extensive testimony and documentary evidence. The Commissioner found that Martone committed 5 violations of the anti-fraud provisions of the Delaware Securities Act (6 *Del.C.* § 7303(2)) and 5 acts of engaging in dishonest and unethical practices in violation of 6 *Del.C.* § 7316(a)(7). Hart was found to have committed 10 violations of each of these provisions. The Commissioner further found Hibbard Brown liable for a total of 30 violations of these statutes (the sum of Martone's and Hart's violations), and 17 violations of 6 *Del.C.* § 7316(10) for failure to supervise its agents. The Commissioner ordered Hibbard Brown to pay $33,000 in fines and almost $48,000 in restitution to the Kriegers and the Flynns. Moreover, the Commissioner permanently revoked the licenses of Martone, Hart, and Hibbard Brown.

The Court of Chancery affirmed the revocation of the licenses of Martone and Hart. The Vice Chancellor modified the penalty imposed on Hibbard Brown, changing the sanction from a permanent revocation to a four-month suspension. The reasons for the modification were (1) Hibbard Brown was not provided sufficient notice that the State was charging it as an undisclosed principal in the Krieger and Flynn transactions, and (2) the penalty imposed was not proportionate to the acts committed by Hibbard Brown.

## II. SCOPE AND STANDARD OF REVIEW

The standard of review for factual findings of the Commissioner is governed by statute. "The findings of the Commissioner as to the facts, if supported by material and substantial evidence, are conclusive." 6 *Del.C.* § 7324(b). In *Blinder, Robinson & Co. v. Bruton,* Del.Supr., 552 A.2d 466 (1989), this Court observed that the statutory standard is "not unlike the traditional test for review of factual findings of administrative agencies." *Id.* at 470. *See Searles v. Darling,* Del.Supr., 83 A.2d 96, 99 (1951) (setting forth a "substantial evidence" standard for reviewing administrative agency findings). Questions of law, however, are reviewed by both the Court of Chancery and this Court *de novo. Blinder, Robinson,* 552 A.2d at 470.

## III. LIABILITY OF HIBBARD BROWN

The Commissioner found that Hibbard Brown acted in violation of 6 *Del.C.* § 7303(2) in connection with the sales of securities to Krieger and Flynn. The Court of Chancery expressly affirmed the finding that Hibbard Brown had failed to disclose adequately its market maker status in violation of section 7303(2). Nevertheless, the Court of Chancery did not find Hibbard Brown to be directly involved in the other fraudulent conduct committed by Martone and Hart.

Section 7303(2) sets forth one of the anti-fraud provisions of the Delaware Securities Act:

It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:

. . . .

(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading. . . .

6 *Del.C.* § 7303(2). The language of section 7303(2) is virtually identical to Securities and Exchange Commission (the "SEC") Rule 10b–5 promulgated by the SEC pursuant to Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (the "1934 Act"). *See Singer v. Magnavox Co.,* Del.Ch., 367 A.2d 1349, 1360 (1976), *aff'd in part and rev'd in part on other grounds,* Del.Supr., 380 A.2d 969 (1977) (observing that "6 *Del.C.* § 7303 is almost identical to, and in fact is identical in the wording of its three subprovi-

sions to, Securities And Exchange Commission Rule 10b–5"). While this Court has not had the opportunity to address the elements of a cause of action under section 7303(2), the similarity of that provision with Rule 10b–5 evidences the General Assembly's intent that it be governed by similar principles.

The legal nexus between section 7303(2) and Rule 10b–5 is further strengthened by an examination of their respective objectives. The purpose of the Delaware Securities Act is "to prevent the public from being victimized by unscrupulous or overreaching broker-dealers, investment advisors or agents in the context of selling securities or giving investment advice...." 6 *Del.C.* § 7301(b). Similarly, "Section 10(b) was designed as a catch-all clause to prevent fraudulent practices." *Chiarella v. United States*, 445 U.S. 222, 226, 100 S.Ct. 1108, 1113, 63 L.Ed.2d 348 (1980).[2] *See also Travis v. Anthes Imperial, Ltd.*, 473 F.2d 515, 522 (8th Cir.1973) (observing that section 10(b) and Rule 10b–5 "were designed to protect investors from deceptive schemes"); *Fox v. Prudent Resources Trust*, 382 F.Supp. 81, 86 (E.D.Pa.1974) (stating that the basic purpose of Rule 10b–5 is "to safeguard investors by policing devices inimical to 'the climate of fair dealing' "). Thus, both federal and state antifraud provisions share the goal of protecting investors by preventing deception.

It is also significant that securities fraud provisions of other states which are modeled on Rule 10b–5 have been interpreted using federal case law applicable to that Rule. *E.g. Commodity Futures Trading Comm'n v. American Metal Exchange Corp.*, 775 F.Supp. 767, 783 (D.N.J.1991) (analyzing a claim under New Jersey's antifraud provision using federal precedent under Rule 10b–5 because of their similarity), *aff'd in part and vacated in part on other grounds*, 991 F.2d 71 (3d Cir.1993); *Branch–Hess Vending Services Employees' Pension Trust v. Guebert*, 751 F.Supp. 1333, 1342 (C.D.Ill.1990) (recognizing that the elements of a violation of the antifraud section of the Illinois Securities Act generally parallel those of Rule 10b–5); *Pelletier v. Zweifel*, 921 F.2d 1465, 1511 (11th Cir.1991) (holding that the same elements are required for Georgia's securities fraud provision and Rule 10b–5), *cert. denied,* —— U.S. ——, 112 S.Ct. 167, 116 L.Ed.2d 131 (1991).

■ Accordingly, in order to establish a violation of section 7303(2), it must be demonstrated that the defendant (1) made a misstatement or omission (2) of material fact (3) with scienter (4) in connection with a purchase or sale of a security (5) upon which the plaintiff (or another person if the action is brought by the Delaware Securities Division) relied and (6) that reliance proximately caused the plaintiff's (or other person's) injury. *See, e.g., In re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1244 (3d Cir.1989).

### A. Hibbard Brown's Direct Involvement in the Fraud

The Commissioner argues on appeal that the "Chancery Court erred by reversing the Commissioner's finding that Hibbard Brown either actively or tacitly encouraged the conduct of its agents." The Commissioner's finding of liability was based on its analysis of Hibbard Brown's Weekly Research Notes. According to the Commissioner, these Notes contained numerous misleading statements and falsehoods evidencing a pattern of dishonesty within the firm. The Court of Chancery, however, found that "Hibbard Brown was not intimately implicated in the wrongdoing," and did not affirm any of the Commissioner's findings of direct liability other than the violations based on the market maker nondisclosure.

■ The Court of Chancery reversed the Commissioner's findings of direct involvement in the fraud apparently because there was no material and substantial evidence of such involvement in the record.[3] We agree

---

2. The 1934 Act as a whole was enacted "principally to protect investors against manipulation of stock prices through regulation of transactions upon securities exchanges and in over-the-counter markets...." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976).

3. Although the Court of Chancery failed to specify its reasons for discounting the evidence relied on by the Commissioner, it is evident that the Vice Chancellor believed such evidence not to be material and substantial because that is the statu-

with this assessment. In the "Company Comments" section of the Weekly Research Notes, Hibbard Brown favorably describes the prospects of a number of companies. These descriptions normally include a discussion of the company's business, financial results, recent developments, management's views, and Hibbard Brown's assessment (usually positive) of the company's prospects. The comments are therefore a combination of specific facts, predictions and statements of opinion.

The Commissioner placed substantial importance on its finding that the Research Notes contained numerous misleading statements and falsehoods. A close scrutiny of the Commissioner's opinion, however, reveals very few actual misrepresentations. Federal courts have recognized that "[s]tatements about future events that are plainly expressions of opinion and not guarantees are not actionable under the federal securities laws." *Hershfang v. Citicorp*, 767 F.Supp. 1251, 1256 (S.D.N.Y.1991). *See also Friedman v. Mohasco Corp.*, 929 F.2d 77, 79 (2d Cir.1991) (holding that Rule 10b–5 claims based on an opinion of financial advisors regarding the expected market value of securities to be issued in a merger did not state a cause of action). An optimistic prediction regarding a company's future prospects is not a "falsehood" absent evidence that it was not made in good faith (i.e., not genuinely believed to be true) or that there was no reasonable foundation for the prediction. *E.g. Eisenberg v. Gagnon*, 766 F.2d 770, 776 (3d Cir.), *cert. denied sub nom., Weinstein v. Eisenberg*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985); *Ciresi v. Citicorp*, 782 F.Supp. 819, 822 (S.D.N.Y.1991), *aff'd mem.*, 956 F.2d 1161 (2d Cir.1992). It is also not *per se* improper to recommend a company simply because its past history is unimpressive.

The fact that a company turns out to be unprofitable does not establish that an earlier prediction of future profitability is fraudulent. *See Eisenberg*, 766 F.2d at 776 (holding that "[i]n establishing *scienter* with respect to projections and opinions, it is insufficient to show ... that a forecast turned out to be incorrect") (citation omitted) (emphasis in original); *Design Time v. Synthetic Diamond Technology*, 674 F.Supp. 1564, 1571 (N.D.Ind.1987) ("Without more, an allegation of faulty economic prognostication will not support an inference of fraud").

Most of the Commissioner's criticism of the Research Notes is based on hindsight and second-guessing. For example, in discussing News Communications, Inc. in the November 6, 1989 issue of Research Notes, Hibbard Brown observes that "the growth forecast for this company is reaching fruition" and predicts that "[w]ithin the next 12–18 months we believe that News Communications can achieve annual revenues in the vicinity of $8 million...." The Commissioner seems to criticize these statements by pointing to the company's $1,249,011 net loss for fiscal 1990. Nevertheless, Hibbard Brown's predictions were made in the context of News Communications' results for the quarter ending August 31, 1989, which were discussed in the Research Notes and indicated a substantial increase in both revenues and profits over the same quarter for the preceding year. The Commissioner has not cited any evidence to show that those predictions were manifestly unreasonable in light of the contemporaneous positive quarterly results. Even though Hibbard Brown's forecasts proved to be incorrect, the Commissioner's second-guessing does not constitute material and substantial evidence of fraudulent conduct.[4]

tory standard for disregarding the Commissioner's factual findings.

4. There are also instances of the Commissioner misconstruing the Research Notes. The Research Notes for May 28, 1990, contained the following comment regarding Graystone Companies, Inc.: "We project revenues will more than double from the $1.55 million for fiscal 1989, and although the company was not profitable last year, we believe it can and will be profitable in fiscal 1990." The Commissioner contends that

this comment contains a material misrepresentation because Graystone's auditor's report for 1989 indicated that sales of $4 million dollars would be needed for profitability. The premise for this contention is that Hibbard Brown was suggesting profitability even though it was projecting 1990 sales at $3.1 million (a doubling of $1.55 million). The Commissioner ignores that Hibbard Brown projected that sales would *"more than* double," which is consistent with its forecast of profitability.

The fact that Hibbard Brown recommended highly speculative companies in its Research Notes is not evidence of fraud since that publication is distributed to a variety of potential customers. Many investors may prefer to buy risky ventures in the hope that the rewards of discovering a future corporate giant will offset the losses from the many companies which fail. Such a strategy may well be appropriate if the investor has a diversified portfolio and is not deceived about the risks. In fact, a number of the securities purchased by Krieger and Flynn were sold at a modest profit, though such gains were reinvested in stocks which suffered substantial losses. The fraud is not what stocks Hibbard Brown recommended, but instead how they were described by the brokers selling them. Martone and Hart, not Hibbard Brown, bear the direct responsibility for concealing the risks associated with the securities they were selling to persons they knew were not well-suited to investing in highly speculative ventures.[5]

■ The only concrete misstatement found by the Commissioner is in the Research Notes dated May 14, 1990, which stated that Children's Creative Workshop, Ltd. was expected to open its first prototype store by the end of that summer. The company's Form 10–Q financial report for the quarter ending January 31, 1990, indicated that the company was not in a position to open the new store until additional financing was obtained. This Form 10–Q was filed with the Securities and Exchange Commission on April 27, 1990, a little over two weeks before the May 14, 1990 issue of Research Notes.

■ We do not find the misstatement in the May 14, 1990 Research Notes to be sufficient to show either a pattern of dishonesty or management approval of fraudulent behavior. Even though Hibbard Brown probably should have been aware sooner of the information in the Form 10–Q, it is certainly plausible that the drafters of the Research Notes were unaware of the statements contained in the Form 10–Q that had been filed only two weeks previously. Moreover, the erroneous information was corrected in the July 16, 1990 Research Notes. Finally, the May 14, 1990 misstatement, as a matter of law, could not support a finding of liability under section 7303(2) in the circumstances presented here. Flynn purchased his shares of Children's Creative Workshop in September and October of 1989, over six months before the misstatement. A violation of section 7303(2) cannot be predicated on after-the-fact statements since neither the "in connection with" requirement nor the reliance element can be established.

Accordingly, we conclude that the Commissioner's finding of direct involvement by the management of Hibbard Brown in the fraud perpetrated by its agents is not supported by material and substantial evidence. The Court of Chancery was therefore correct not to affirm that finding and the violations premised on it.[6]

### B. Hibbard Brown's Market Maker Status

The Court of Chancery held that Hibbard Brown violated section 7303(2) by failing to

---

**5.** Although we hold that there is insufficient evidence of Hibbard Brown directly encouraging or participating in the fraudulent conduct of Martone and Hart, we do not condone or excuse its failure to oversee the actions of its agents. The duty of a broker-dealer to supervise its agents is not only required by 6 *Del.C.* § 7316(a)(10), it is also essential to fulfilling the purpose of the Delaware Securities Act, which is "to prevent the public from being victimized by unscrupulous or overreaching broker-dealers, investment advisors or agents in the context of selling securities or giving investment advice...." 6 *Del.C.* § 7301(b). Hibbard Brown has not appealed from the Commissioner's finding that Hibbard Brown violated 6 *Del.C.* § 7316(a)(10) by failing to supervise its agents.

**6.** The Commissioner had found Hibbard Brown to be liable for failing to disclose its status as a principal in the securities transactions at issue. The Court of Chancery reversed this finding because it held the company's due process rights were violated. Specifically, the Court of Chancery held that Hibbard Brown was not given fair notice, as mandated by the due process requirements of the Fifth and Fourteenth Amendments of the United States Constitution, that it was charged with being a principal, thereby preventing it from being able to respond adequately to that charge. The Commissioner does not appeal from the Court of Chancery's determination that Hibbard Brown was not accorded its due process rights.

make a sufficient disclosure regarding its status as a market maker in the stocks they recommended for purchase. On the purchase confirmation slips sent to Delaware investors, Hibbard Brown stated "WE MAKE A MKT IN THIS SECURITY." [7] While observing that "such disclosure [may be] sufficient in some cases under Federal Securities laws," and that this statement may suffice for sophisticated investors, the Court of Chancery concluded:

> However, in the present case, the investors were unsophisticated and relied upon the information provided to them by HB and its agents. A one-line disclosure statement to such clients does *not* meet the adequacy requirements imposed on HB by 6 *Del.C.* § 7303(2).

*Hibbard Brown & Co. v. Hubbard,* Del.Ch., C.A. No. 12451, 1992 WL 389927, *5, slip op. at 12, Chandler, V.C. (Dec. 21, 1992) (emphasis in original).

"Whether disclosures are adequate is a mixed question of law and fact." *Zirn v. VLI Corp.,* Del.Supr., 621 A.2d 773, 777 (1993). Therefore, the findings of the Court of Chancery with respect to the adequacy of disclosures will be upheld if they are sufficiently supported by the record and are the product of an orderly and logical deductive process. *Shell Petroleum, Inc. v. Smith,* Del.Supr., 606 A.2d 112, 114 (1992); *Levitt v. Bouvier,* Del.Supr., 287 A.2d 671, 673 (1972). Nevertheless, this Court's review of the legal standards formulated and applied by the Court of Chancery is *de novo. See Zirn,* 621 A.2d at 777.

The Court of Chancery erred as a matter of law by relying on the lack of sophistication of Messrs. Krieger and Flynn

in holding that Hibbard Brown's disclosure was inadequate. The adequacy of disclosure is determined by focusing upon a *reasonable* investor, and not by considering the attributes of the particular investor at issue. In the context of a director's duty of disclosure, this Court has held that the materiality of omitted information is determined using the standards enunciated in *TSC Industries v. Northway,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).[8] *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 944 (1985) (adopting the *TSC* standard for determining compliance with the duty of disclosure); *Stroud v. Grace,* Del.Supr., 606 A.2d 75, 84 (1992) (reaffirming *Rosenblatt's* holding regarding the *TSC* materiality standard).

This Court recently stressed that "[t]he *TSC* materiality standard is an objective one, measured from the point of view of the *reasonable investor.*" *Zirn v. VLI Corp.,* Del. Supr., 621 A.2d 773, 779 (1993) (emphasis in original). The United States Supreme Court has held that the materiality of misrepresentations and omissions in the Rule 10b–5 context is governed by the objective "reasonable investor" standard set forth in *TSC Industries. Basic v. Levinson,* 485 U.S. 224, 230–32, 108 S.Ct. 978, 982–84, 99 L.Ed.2d 194 (1988). In light of the fact that section 7303(2) and Rule 10b–5 are identically worded and have a similar purpose in protecting investors from fraudulent conduct in securities transactions, there is no reason why they should have different standards for materiality. Accordingly, the sophistication of the particular investor involved is not an appropriate consideration in assessing the adequa-

---

7. Hibbard Brown's monthly account statements contain the same market maker disclosure as is printed on the confirmation slips. Moreover, the weekly "Research Notes" mention that Hibbard Brown "makes a market in" a stock when the corporation issuing the stock is discussed therein.

8. The materiality standard in *TSC Industries* provides as follows:

> An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... It does not require proof of a substantial likelihood that disclosure of the

omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

426 U.S. at 449, 96 S.Ct. at 2132.

cy of disclosure under either Rule 10b–5 or section 7303(2).[9]

■ Furthermore, the Court of Chancery's holding on the adequacy of the phrase "WE MAKE A MKT IN THIS SECURITY" is inconsistent with federal case law under Rule 10b–5 (as the Vice Chancellor recognized). In *Pross v. Baird, Patrick & Co.*, 585 F.Supp. 1456 (S.D.N.Y.1984), the Southern District of New York held that the identical phrase used by Hibbard Brown was a sufficient disclosure of market maker status for purposes of Rule 10b–5. *Id.* at 1459. The Court of Chancery's holding that the disclosure used by Hibbard Brown violated section 7303(2), even though the same language satisfies Rule 10b–5, creates the risk of uncertainty and confusion.

We therefore reverse the finding of the Commissioner and the Court of Chancery that Hibbard Brown violated section 7303(2) by failing to disclose its status as a market maker. Because the Court of Chancery based its four-month suspension of Hibbard Brown on the four statutory violations it found, our reversal of the two nondisclosure violations reduces the suspension to two months.[10]

## IV. THE SANCTIONS IMPOSED AGAINST HIBBARD BROWN

The Commissioner asserts on appeal that the Court of Chancery should have used an abuse of discretion standard in reviewing the sanctions imposed by the Commissioner. According to the Commissioner, the Court of Chancery confused its power to modify the Commissioner's remedy with the applicable standard of review.

■ In *Blinder, Robinson*, this Court recognized:

The Court of Chancery is accorded broad power of review and may modify the Commissioner's order "in whole or in part", 6 *Del.C.* § 7324(a), and we view that authori-

ty as encompassing the power to modify any administrative sanction *which is deemed disproportionate* to the underlying conduct.

552 A.2d at 475 (emphasis added). Consistent with the language of the statute and our opinion in *Blinder, Robinson*, we hold that the Court of Chancery may review *de novo* the remedy ordered by the Commissioner. The power of the Court of Chancery to modify an order whenever it deems the sanction imposed to be disproportionate is neither expressly nor implicitly limited to instances where the Commissioner abused its discretion.

■ The Commissioner also fails to demonstrate any error in the Court of Chancery's proportionality analysis. The Vice Chancellor's decision to reduce the sanction against Hibbard Brown from permanent revocation to a four-month suspension was based on his analysis of the *Blinder, Robinson* decision and his assessment of the magnitude of Hibbard Brown's violations. Since the Commissioner's findings of direct liability were discarded because of lack of substantial evidence, the Court of Chancery concluded that a reduction in the severity of the sanctions imposed was appropriate. We agree and therefore affirm.

## V. THE NUMBER OF STATUTORY VIOLATIONS

The Commissioner argues that the Court of Chancery "erred by reducing the number of supervisory violations to only two when there had been many fraudulent transactions by Hibbard Brown's agents due to the lack of proper supervision." We emphasize that the nature of the violations is substantially more important than the number of violations for purposes of determining an appropriate sanction. Nevertheless, we will address the issue

---

**9.** We note that the sophistication of a buyer or seller is a relevant consideration in analyzing the reliance element of a section 7303(2) claim. An unsophisticated investor is more likely to rely on the advice of a broker than is a sophisticated investor. This reliance issue, however, need not be reached where material information has not been withheld.

**10.** In light of the holding in *Pross* and the absence of any contrary authority or evidence in the record, we conclude that a remand to consider the adequacy of the market maker disclosure under the reasonable investor standard is not required in this case because the legal sufficiency of the precise language used by Hibbard Brown has already been judicially upheld.

in order to aid litigants in future proceedings.

■ The Commissioner's method of determining the number of violations for failure to supervise is to count each sale of a security as a separate violation. The Court of Chancery's approach is to count the failure to supervise each agent as a separate violation without regard to the number of sales each agent makes. In our opinion, the Vice Chancellor's method is correct. The statute imposes liability for a failure to supervise agents, not for sales by unsupervised agents. *See* 6 *Del.C.* § 7316(a)(10). While the number of sales made by the unsupervised agent may well affect the remedy imposed (particularly the amount of restitutionary damages), it should not determine the number of violations. Under the Commissioner's approach, a company which fails to supervise ten agents, each of whom makes one sale, would be found to have committed the same number of violations as a company which failed to supervise only one agent making ten sales. In our view, the lack of supervision in the former instance is the more culpable because it demonstrates a more widespread failure of oversight.[11]

We therefore conclude that the Court of Chancery did not err in finding that Hibbard Brown committed two violations, and not seventeen, of section 7316(a)(10).

## VI. THE AWARD OF RESTITUTIONARY DAMAGES

In their cross-appeal, Hibbard Brown, Martone, and Hart assert that the Court of Chancery erred by (1) affirming the section 7303(2) violation based on nondisclosure of Hibbard Brown's market maker status, (2) affirming the award of restitutionary damages to Krieger and Flynn through the retroactive application of 6 *Del.C.* § 7325(b), and (3) not modifying the Commissioner's revocation of the licenses of Martone and Hart. The first claim has already been addressed. The second and third claims are discussed below.

The Commissioner ordered Hibbard Brown to pay approximately $48,000 of restitutionary damages to Krieger and Flynn to compensate them for their losses in the securities transactions recommended by Martone and Hart. This award was based on a retroactive application of 6 *Del.C.* § 7325(b), which was amended by 67 Del.Laws, c. 274, effective July 2, 1990. Section 7325(b), as amended, authorizes the Commissioner to order, *inter alia,* "restitution to investors."

■ Delaware courts have recognized the general principle that statutes will not be retroactively applied unless there is a clear legislative intent to do so. *E.g. Chrysler Corp. v. State,* Del.Supr., 457 A.2d 345, 351 (1983). Nevertheless, "a statutory amendment is remedial, and may apply retroactively, when it relates to practice, procedure or remedies and does not affect substantive or vested rights." 2 Norman J. Singer, *Sutherland Stat. Const.* § 41.09, at 399 (5th ed. 1993). *See also* 82 C.J.S. *Statutes* § 421 (1953) ("As a general rule statutes relating to remedies and procedure are given a retrospective construction"). Accordingly, as the Superior Court has recognized, "Statutes which retrospectively make reasonable change in remedy are not impermissible." *Mergenthaler v. Asbestos Corp. of America, Inc.,* Del.Super., 534 A.2d 272, 277 (1987).

■ In light of these principles, we find that the Court of Chancery was correct when it affirmed the award of restitutionary damages pursuant to 6 *Del.C.* § 7325(b). The new amendment to that section merely specifies the remedies that may be ordered by the Commissioner. The listing of remedies in section 7325(b) does not affect the substantive rights of Hibbard Brown and/or its agents because, under the Delaware Securities Act, they would have been liable for such damages in a suit brought by the defrauded investors. *See* 6 *Del.C.* § 7323(a)(2). The fact that section 7325(b) now makes clear that the Commissioner may order "restitution to investors" for such violations in the

---

11. A court should be careful not to be overly mechanical in determining the number of violations. A failure to supervise one agent for many years should probably be considered more than just a single violation. The number of violations must therefore depend upon the circumstances of each case.

absence of a suit by the injured investors does not increase Hibbard Brown's ultimate liability or otherwise affect its substantive or vested rights.

Accordingly, we affirm the Court of Chancery's decision to affirm the award of restitutionary damages as based on a correct analysis and application of the legal principles governing retroactive application of statutory changes.

## VII. THE REVOCATION OF THE LICENSES OF MARTONE AND HART

■ Cross-appellants appeal the Commissioner's sanction against Martone and Hart. The Commissioner made extensive factual findings regarding the improper conduct of Martone and Hart, including their advising investors to purchase highly risky and speculative stocks without disclosing the dangers involved. The taped conversations of Martone also reflect his making categorical statements about future stock prices (e.g., "Children's is definitely going to go back up") and suggesting that he personally performed due diligence on companies which he later admitted not having done. These findings were accepted by the Court of Chancery as being supported by substantial evidence. While Hibbard Brown cites testimony and evidence to try to rebut these findings, we agree with the Court of Chancery that there is substantial evidence to support the Commissioner's factual findings. Such findings are therefore conclusive. 6 Del.C. § 7324(b).

In light of the findings of egregious conduct by Martone and Hart, the revocation of their licenses cannot be considered an abuse of discretion. The intent and policy of the Delaware Securities Act is to prevent "unscrupulous" and "overreaching" brokers from victimizing citizens of Delaware. 6 Del.C. § 7301(b). Revoking the licenses of such brokers is completely consistent with this goal.

## VIII. CONCLUSION

We therefore conclude that the Commissioner has failed to demonstrate any error by the Court of Chancery. The Vice Chancellor properly did not affirm the Commissioner's finding of direct liability of Hibbard Brown because it is not supported by material and substantial evidence in the record. Moreover, we agree with the Court of Chancery's method of determining the number of violations of the statute and its conclusion regarding the appropriate magnitude of the sanction to be imposed.

With respect to the cross-appeal, Hibbard Brown has not shown that the award of restitutionary damages through the retroactive application of 6 Del.C. § 7325(b) was erroneous under applicable legal principles governing the retroactive application of statutory amendments which provide only additional remedies. Moreover, the Court of Chancery properly exercised its discretion in affirming the revocation of the licenses of Martone and Hart in light of the substantial evidence establishing their misconduct. By contrast, the Court of Chancery's conclusion that Hibbard Brown failed to disclose adequately its status as a market maker is erroneous as a matter of law because it is based on the particular stock purchaser's lack of sophistication rather than what a reasonable investor would understand.

We **AFFIRM** the Court of Chancery's decision upholding the license revocation of Martone and Hart and the finding that Hibbard Brown failed to supervise them. We **REVERSE** the Court of Chancery's conclusion that Hibbard Brown failed to disclose adequately its market maker status and **REMAND** the matter for further proceedings consistent with this opinion.[12]

■

---

12. We have remanded this matter to enable the Court of Chancery to take such steps as are necessary and appropriate for a final disposition of this action, including the entry of a final order specifying the fines and other sanctions against appellants. We do not believe that any further evidentiary proceedings or merits-related deter-

minations by the Commissioner or the Court of    Chancery are required. *See* n. 10 herein.