# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

CHATHAM ASSET MANAGEMENT, )
LLC, CHATHAM FUND, LP, and )
CHATHAM ASSET HIGH YIELD )
MASTER FUND, LTD., )
individually and derivatively on behalf )
of TWIN RIVER WORLDWIDE )
HOLDINGS, INC., )
                                     )
            Plaintiffs, )
                                     )
    v. )        C.A. No. 2017-0088-AGB
                                     )
GEORGE PAPANIER, JOHN E. )
TAYLOR, JR., SOO KIM, STEPHEN )
H. CAPP, CRAIG L. EATON, GLENN )
CARLIN, PHIL JULIANO, and JAY )
MINAS, )
                                     )
            Defendants, )
                                     )
      and )
                                     )
TWIN RIVER WORLDWIDE )
HOLDINGS, INC., )
                                     )
     Nominal Defendant. )

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' PARTIAL MOTION TO DISMISS

WHEREAS:

A.    Nominal defendant Twin River Worldwide Holdings, Inc. ("Twin River" or the "Company"), a Delaware corporation, is a holding company in the gaming industry with casinos and other operations in Rhode Island, Mississippi, and

Colorado.[1] Twin River has its principal place of business in Lincoln, Rhode Island. The Rhode Island Department of Business Regulation ("DBR") regulates the Company and imposes limitations on the ownership of Twin River stock, which are set forth in regulatory agreements with the Company's stockholders.[2]

B.    On November 15, 2016, Twin River announced a tender offer to purchase up to 250,000 shares of its common stock (the "Tender Offer"). Twin River sent its stockholders a 23-page Offer to Purchase ("OTP") describing the background and terms and conditions of the Tender Offer. The Tender Offer closed on December 16, 2016.

C.    Plaintiffs Chatham Fund, LP and Chatham Asset High Yield Master Fund, Ltd. hold common stock of Twin River. The investment advisor of these entities is plaintiff Chatham Asset Management, LLC. This order refers to these three entities together as "Chatham." Before the Tender Offer, Chatham owned just under 15% of Twin River's stock, which was its regulatory limit.[3]

D.    At the time of the Tender Offer, the directors of Twin River were George Papanier, John E. Taylor, Soo Kim, and Stephen H. Capp (together, the "Director Defendants"). Kim also is the Managing Partner and Chief Investment

---

[1] The facts recited herein are taken from the Second Amended Complaint ("Compl.") and documents incorporated therein. (Dkt. 94)

[2] Compl. ¶ 22.

[3] *Id.*

2

Officer of Standard General, L.P. ("Standard General"), a hedge fund that has voting and investment control over Standard RI Ltd., Twin River's largest stockholder.[4]

E.     The Complaint names as the "Officer Defendants" two individuals: Craig L. Eaton, Senior Vice President, General Counsel, Secretary, and Compliance Officer of Twin River; and Glenn Carlin, Executive Vice President of Corporate Development, Chief Financial Officer, and Treasurer of Twin River.

F.     The remaining two individual defendants are Phil Juliano, Senior Vice President and Chief Marketing Officer of Twin River; and Jay Minas, Vice President of Finance of Twin River.

G.     On January 9, 2019, Chatham filed the Second Amended Complaint (the "Complaint"), asserting fourteen claims. On February 20, 2019, defendants moved to dismiss nine of those claims under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief.

H.     On September 4, 2019, the court heard oral argument on the partial motion to dismiss. By that time, the parties had stipulated to or did not oppose the dismissal of four of the nine claims (Counts VI, VIII, X, and XI).[5] At the conclusion of oral argument, the court denied the motion to dismiss as to Count III, granted the

---

[4] *Id.* ¶¶ 25-26.

[5] Dkt. 123; Dkt. 128; Pls.' Opp'n Br. 6 n.5 (Dkt. 111).

motion as to Count VII, and requested supplemental briefing, which the parties completed on October 4, 2019.[6]

I.    This order addresses the remaining three claims, which are for breach of fiduciary duty: Counts IV, V, and IX. Counts IV and V are disclosure claims. Count IX challenges the purpose and structure of the Tender Offer.

NOW THEREFORE, the court having considered the parties' submissions, IT IS HEREBY ORDERED this 13th day of January, 2020, as follows:

1.    The standards governing a motion to dismiss for failure to state a claim for relief are well-settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are "well-pleaded" if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and ([iv]) dismissal is inappropriate unless the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible to proof."[7]

2.    Under Delaware law, an omitted fact is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[8] Stated differently, to be material, an omitted fact, if disclosed, "would

---

[6] Mot. to Dismiss Hr'g Tr. 142-144 (Sept. 4, 2019) (Dkt. 131); Dkt. 128.

[7] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (internal citations omitted).

[8] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

4

have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[9]

3.      **Count IV.**  This is a direct claim against the Director and Officer Defendants for breaching their fiduciary duties by failing to disclose in the OTP the "preferential treatment given to one stockholder, Standard General," at the time of the Tender Offer.[10]  According to Chatham, the gravamen of this claim is that defendants "breached their disclosure duties by failing to inform stockholders that they had secured approval for Standard General to exceed regulatory limits as a result of its non-participation in the Tender Offer."[11]  The "approval" in question refers to a November 9, 2016 letter from the DBR confirming that, by not participating in the Tender Offer, Standard General "will not be in violation" of a previous DBR approval allowing it to acquire up to 19.9% of Twin River's stock, which had expired over two years before the Tender Offer closed.[12]

4.      Defendants' motion to dismiss Count IV is **GRANTED** because Chatham has failed to show that the OTP omitted any facts concerning Standard General that would have been material to a reasonable stockholder in deciding whether to participate in the Tender Offer.

---

[9] *Id.*

[10] Compl. ¶ 130.

[11] Pls.' Opp'n Br. 39.

[12] *See* Compl. Ex. F.

5

5.     The OTP disclosed that (i) Twin River had 9,831,069 outstanding shares of common stock as of November 15, 2016, (ii) Standard General owned 1,560,831 shares or approximately 15.9% of Twin River's outstanding common shares as of that date; and (iii) Standard General did not intend to participate in the Tender Offer.[13]  From these disclosures, Twin River's stockholders could determine the potential impact Standard General would have on the Tender Offer, i.e., the level of proration a stockholder might experience in deciding to tender given that Standard General would not be tendering.[14]  Insofar as Standard General is concerned, Chatham has failed to demonstrate that a reasonable stockholder would need any additional information to decide whether to participate in the Tender Offer.

6.     Chatham argues that "the DBR's approval was *material to Chatham*," which allegedly "believed . . . that it had no choice but to participate in the Tender Offer because of regulatory requirements."[15]  It defies reason that Chatham—a sophisticated hedge fund—was unaware that it could have tried to seek approval from the DBR in order to avoid having to tender irrespective of whether Standard

---

[13] *Id.* Ex. K, at 2, 4, 7, 16.  The OTP further disclosed that affiliates of Standard General had "entered into agreements to purchase, subject only to regulatory approvals" that were "expected to be received this calendar quarter," an additional 1,658,937 shares (approximately 16.9%) from affiliates of Bain Capital Credit LP. *Id.* at 2, 7, 16.

[14] *See* Pls.' Suppl. Br. 9-10 (contending that a "disclosure that could impact the number of shares tendered by other stockholders" would be material) (Dkt. 132).

[15] Pls.' Opp'n Br. 40 (emphasis added); Compl. ¶ 60.

General had obtained such an approval. Indeed, Chatham acknowledges it could have sought such approval "directly" from the DBR without Twin River's assistance.[16] In any event, Chatham's interest in obtaining an approval from the DBR to avoid tendering is idiosyncratic to Chatham and thus irrelevant to whether Count IV states a claim for relief because "[t]he adequacy of disclosure is determined by focusing upon a *reasonable* investor, and not by considering the attributes of the particular investor at issue."[17]

7.      **Count V.** This is a direct claim against the Director and Officer Defendants for breaching their fiduciary duties by failing to disclose in the OTP approximately $3.8 million in "Make-Whole Payments" that were paid to certain directors and officers of Twin River in November 2016.[18] The background concerning these payments follows.

8.      In November 2010, when Twin River emerged from bankruptcy, the claims of its second lien debtholders were discharged in exchange for Collateral Value Rights ("CVRs") entitling those holders to receive certain payments upon the occurrence of a "CVR Payment Event."[19] In or around January 2013, Twin River

---

[16] Pls.' Opp'n Br. 40 ("[I]f defendants had disclosed the DBR's approval, Chatham would have sought similar approval from the DBR, directly or with Defendants' assistance.").

[17] *Hubbard v. Hibbard Brown & Co.*, 633 A.2d 345, 352 (Del. 1993).

[18] Compl. ¶ 136.

[19] *Id.* ¶¶ 39-40.

7

entered into "Make-Whole Agreements" with certain insiders, "purportedly . . . to align [the] economic incentives" of these individuals and the CVR holders.[20] Under the Make-Whole Agreements, Twin River would pay a cash award upon the occurrence of a CVR Payment Event.[21]

9.     In December 2015, Twin River announced a CVR repurchase, which prompted the filing of a derivative action in the Court of Chancery challenging that transaction.[22] The parties to that action negotiated a settlement whereby Twin River increased the price of the offer to purchase the CVRs from $400 to $450.[23] In June 2016, the CVR repurchase closed.[24]

10.     In November 2016, the Director Defendants authorized a total of $3.8 million in Make-Whole Payments to the Director Defendants (except Kim) and the Officer Defendants.[25] Twin River references these payments in its 2016 financial statements for the year ended December 31, 2016, which the Company disclosed on March 30, 2017—after the Tender Offer closed.[26]

---

[20] *Id.* ¶ 41.

[21] Dkt. 112 ¶ 1.

[22] Compl. ¶ 44.

[23] *Id.* ¶¶ 43, 45.

[24] *Id.* ¶ 50.

[25] *Id.* ¶ 52.

[26] Pls.' Opp'n Br. 43; Defs.' Reply Br. 28 n.10 (Dkt. 115).

11. Defendants contend that Twin River was contractually obligated to pay the $3.8 million under the Make-Whole Agreements because the CVR repurchase triggered a CVR Payment Event.[27] Chatham disagrees. It contends that the CVR repurchase did not trigger a CVR Payment Event.[28] Chatham further contends that the failure to disclose in the OTP that defendants "paid themselves $3.8 million of Company funds to which they were not entitled . . . harmed Chatham and Twin River's stockholders generally by distorting their ability to value their shares and make informed decisions as to whether they should sell their shares in the Tender Offer."[29]

12. Defendants' motion to dismiss Count V is **GRANTED** for two reasons. First, insofar as Chatham contends that the defendants were obligated to disclose that "they were not entitled" to the Make-Whole Payments, such a disclosure would violate the rule against "self-flagellation."[30] Second, the OTP's omission of any disclosure concerning the $3.8 million in Make-Whole Payments—even unadorned

---

[27] *See* Compl. ¶ 55.

[28] *Id.* ¶ 52.

[29] Pls.' Opp'n Br. 48.

[30] *See Stroud v. Grace*, 606 A.2d 75, 84 n.1 (Del. 1992) ("[T]o comport with its fiduciary duty to disclose all relevant material facts, a board is not required to engage in 'self-flagellation' and draw legal conclusions implicating itself in a breach of fiduciary duty from surrounding facts and circumstances prior to a formal adjudication of the matter."); *Loudon v. Archer-Daniels-Midland Co.*, 700 A.2d 135, 143 (Del. 1997) ("The directors' duty of disclosure does not oblige them to characterize their conduct in such a way as to admit wrongdoing.").

by a characterization of wrongdoing—would not have been financially material to a reasonable stockholder in deciding whether to participate in the Tender Offer.

13. The OTP incorporates by reference a number of financial documents posted on Twin River's investor website, including (i) its financial statements for the year ended December 31, 2015, and the nine months ended September 30, 2016; and (ii) an October 20, 2016 lender presentation, which included an estimate of its results of operation for all of 2016.[31] The OTP also states that, on or before December 12, 2016, the Company would publish on its website (and thus incorporate into the OTP by reference) its investor presentation for the third quarter of 2016.[32]

14. Given the financial information that was available to the Company's stockholders, including the documents described above, the relevant question is whether the failure to make a disclosure concerning the $3.8 million in Make-Whole Payments in connection with the Tender Offer would have significantly altered the "total mix" of information available to stockholders. In the court's opinion, it would not have done so.

15. Based on the Tender Offer price of $80 per share and the number of Twin River shares outstanding (9,831,069) when the Tender Offer commenced, Twin River's market capitalization was approximately $786.5 million. According

---

[31] Compl. Ex. K, at 15.
[32] Id.

10

to the Complaint, Twin River's market capitalization was approximately $766.5 million as of December 30, 2016, about two weeks after the Tender Offer closed.[33] Thus, by either measure, the $3.8 million in Make-Whole Payments equated to less than 0.5% of Twin River's market capitalization. Even if one assumed that the $3.8 million in Make-Whole Payments were improper and that Twin River could recover this full amount—a highly questionable assumption[34]—disclosure of such a potential recovery would not have significantly altered the "total mix" of information in my view.

16.    Notably, Chatham does not contest the financial immateriality of $3.8 million relative to Twin River's market capitalization. Chatham argues instead that one should compare the $3.8 million in Make-Whole Payments to Twin River's working capital, the size of the Tender Offer, or the amount of compensation paid to Twin River's directors.[35] Chatham provides no authority for making any of these comparisons, and the court is unpersuaded that any of them makes sense in the context of the Tender Offer. It is far more logical that a reasonable stockholder would consider the overall value of the corporation to be the key consideration in deciding whether the Tender Offer price offered fair value for one's shares.

---

[33] Compl. ¶ 14.

[34] One logically would discount a potential recovery of $3.8 million based on, among other factors, the probability of the recovery and the costs of obtaining any recovery.

[35] Pls.' Suppl. Br. 12.

11

17. **Count IX.** This is a direct claim against the Director and Officer Defendants for breaching their fiduciary duties "by making decisions with respect to the form, size, and price of the Tender Offer to benefit their own personal interests rather than those of the stockholders generally, and by granting preferential treatment to one stockholder to the detriment of others."[36] More specifically, the Complaint alleges that these individuals structured the Tender Offer as a scheme to force other stockholders who were close to their regulatory limits of ownership to decrease their holdings in Twin River so that the Company would be able to purchase shares that some of them had "put" to the Company.[37] The Complaint further alleges that to make the scheme work, the Company obtained DBR "approval" that Standard General would not violate its regulatory limit by not tendering.[38] This was necessary because Standard General was in the process of trying to increase its ownership of the Company—to exceed 30%—and did not want to tender any of its shares.[39]

18. The Complaint explains that five individuals (Papanier, Taylor, Capp, Eaton, and Juliano) who were parties to "Put Agreements" executed irrevocable put requests in October 2016 to sell a total of 124,758 shares back to the Company for

---

[36] Compl. ¶ 154.

[37] *Id.* ¶¶ 87-91, 154.

[38] *Id.* ¶¶ 66-68.

[39] *Id.* ¶ 62; *id.* Ex. K, at 7, 16.

12

approximately $9.15 million.[40] Honoring these puts was problematic, however, because the Company's purchase of these shares would decrease the number of its outstanding shares and concomitantly increase the ownership *percentage* of the other stockholders, which could cause some of those stockholders to exceed their regulatory ownership limits. Thus, as Chatham alleges, one of the purposes of the Tender Offer was to force "stockholders, like Chatham, that were close to the regulatory limits to decrease their holdings so the Company could honor the Selling Defendants' Puts."[41] Chatham further alleges that it was harmed by the scheme because it was forced to tender 35,954 shares for $80 per share that it believes were worth more.[42]

19. Although the Company ultimately did not purchase any of the shares that had been put to it in October 2016,[43] and although it is far from clear that the alleged scheme could even work,[44] the allegations of the Complaint are sufficient to support a reasonably conceivable claim for breach of fiduciary duty against the Director Defendants and Eaton.

---

[40] Compl. ¶ 78.

[41] *Id.* ¶ 88.

[42] *Id.* ¶ 156.

[43] *Id.* ¶ 96; *id.* Ex. O.

[44] *See, e.g.,* Compl. ¶ 95 (alleging that defendants realized two days after the Tender Offer closed that "the Tender Offer had not decreased the ownership of stockholders near a regulatory limit enough to permit Twin River to settle the Puts").

13

20. As to the Director Defendants, who "authorized the Tender Offer's form, size, price, and launch,"[45] they each allegedly expected to receive in connection with the transaction a "personal financial benefit . . . as opposed to a benefit which devolves upon the corporation or all stockholders generally,"[46] which would subject the transaction to entire fairness review.[47] In the case of Papanier, Capp, and Taylor, the alleged benefit was the hoped-for opportunity to sell a substantial number of their shares to the Company: 61,703 shares for Papanier for $4,535,170; 20,203 shares for Capp for $1,484,920; and 12,000 shares for Taylor for $858,000.[48] In the case of Kim, the alleged benefit was securing an approval that the hedge fund he managed, Standard General, would not need to tender any of its shares.

21. As to Eaton, he interacted with the DBR as part of the alleged scheme to secure approval for Standard General to abstain from the Tender Offer and

---

[45] *Id.* ¶ 58.

[46] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

[47] *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 42 n.9 (Del. 1994) ("Where actual self-interest is present and affects a majority of the directors approving a transaction, the court will apply even more exacting scrutiny to determine whether the transaction is entirely fair to the stockholders."); *Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *26 (Del. Ch. Apr. 14, 2017) ("At the pleading stage, to change the standard of review from the business judgment rule to entire fairness, the complaint must allege facts supporting a reasonable inference that there were not enough sufficiently . . . disinterested individuals who acted in good faith when taking the challenged actions to comprise a board majority.").

[48] Compl. ¶ 78; *id.* Exs. G, H, J.

14

allegedly hoped to benefit from the scheme by selling 20,568 of his shares to the Company for $1,511,748.[49]

22. Count IX fails, however, to plead a reasonably conceivable claim for breach of fiduciary duty against Carlin because he was not a party to a Put Agreement and is not alleged to have sought or obtained a personal benefit from the transaction.

23. For these reasons, defendants' motion to dismiss Count IX is **DENIED** as to the Director Defendants and Eaton but **GRANTED** as to Carlin.

_____
Chancellor

---

[49] Compl. ¶¶ 63, 66, 78; *id.* Ex. I.

15