# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PROMISE EASY LIMITED, | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| | ) | |
| v. | ) | C.A. No. 12438-CM |
| | ) | |
| CHULSO MOON, JS YOON MEMORIAL CANCER RESEARCH INSTITUTE, LLC, FORECAST GENETICS, INC., FORESECAST GENETICS HOLDING CO., INC., PROSPECT GENETICS, INC., PROSPECT RESEARCH, INC., and PROSPECT OPERATIONS, INC., | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants/Counterclaim Plaintiffs. | ) ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted:  June 5, 2023
Date Decided:  August 10, 2023

John G. Harris, Peter C. McGivney, BERGER HARRIS LLP, Wilmington, Delaware; *Counsel for Plaintiff and Counterclaim Defendant Promise Easy Limited.*

Julia B. Klein, KLEIN LLC, Wilmington, Delaware; *Counsel for Defendants and Counterclaim Plaintiffs Chulso Moon, JS Yoon Memorial Cancer Research Institute, LLC, Forecast Genetics, Inc., Forecast Genetics Holding Co., Inc., Prospect Genetics, Inc. Prospect Research, Inc., and Prospect Operations, Inc.*

**McCORMICK, C.**

Dr. Chulso Moon convinced Promise Easy Limited to invest up to $2 million to develop and commercialize a test to diagnose individuals at high risk for breast cancer. Among other things, Dr. Moon represented to Promise Easy that he could commercialize this test within 18 months of receiving the first $500,200 advance and that the test would achieve an accuracy level of at least 95%. Dr. Moon provided information about the cost, timing, and viability of the diagnostic test, which, before the investment, was indefinitely stuck in the research phase. Dr. Moon stated that he already had relationships, agreements, and laboratory facilities in place that would enable speedy passage through the regulatory hurdles standing between his test and commercialization. Promise Easy took the bait and advanced $500,200. Dr. Moon took the money but failed to deliver. Promise Easy noticed breach and brought this suit against Dr. Moon and his entities, alleging violations of the Delaware Securities Act, breach of express and implied contractual provisions, and fraudulent inducement. At trial, Promise Easy proved that Dr. Moon knew that much of what he represented to Promise Easy was false and that he breached his contractual obligations. This post-trial decision enters judgment in favor of Promise Easy on most of its claims.

I.      FACTUAL BACKGROUND

Trial took place by Zoom over two days. As reflected in the Joint Schedule of Evidence submitted by the parties, the record comprises 60 joint trial exhibits, trial

testimony from three fact witnesses, and deposition testimony from the same three fact witnesses.[1] These are the facts as the court finds them after trial.

### A. Dr. Moon Presents His Research To NYG Capital.

Dr. Chulso Moon is an oncologist with a medical degree from Seoul National University in South Korea and a Ph.D from Johns Hopkins University in human genetics and molecular biology.[2] Dr. Moon's resume is extensive and impressive. After obtaining his Ph.D, he did a combined residency and fellowship program in oncology, and he has since taught cancer biology and clinical oncology at Johns Hopkins.[3] Dr. Moon began conducting independent research in 2001, and he eventually founded his own independent research foundation, Defendant JS Yoon Memorial Cancer Research Institute ("JS Yoon"), on behalf of his mother who died of breast cancer.[4] Dr. Moon's area of research involves developing tests for genetic and other biomarkers of cancer.[5] He has published more than 40 articles and given over 60 presentations on this research.[6]

One such presentation kicked off the events in this lawsuit. In January 2015, Dr. Moon presented his research to New York Global Capital ("NYG Capital") in New York

---

[1] *See* C.A. No. 12438-CM, Docket ("Dkt.") 128 (Joint Schedule of Evid.). This decision cites to: trial exhibits (by "JX" number); the trial transcript, Dkts. 90–91 (by "Trial Tr. at" page, line, and witness); and the deposition transcripts of Chulso Moon, Benjamin Wey, and Warren Raiti (by the deponent's last name and "Dep. Tr. at" page and line).

[2] Trial Tr. at 233:8–234:3 (Moon).

[3] *Id.* at 234:4–19 (Moon).

[4] *Id.* at 234:23–235:8 (Moon).

[5] JX-34 at 5–6.

[6] Trial Tr. at 235:9–13 (Moon).

City.[7] NYG Capital's CEO and founder Benjamin Wey, General Counsel James Baxter, and Assistant General Counsel Warren Raiti attended the January 2015 presentation.[8] One of Dr. Moon's good friends, Larry Agulnick, had set up the meeting.[9]

Wey and Raiti understood Dr. Moon's presentation to be a pitch for funding.[10] According to Wey and Raiti, Dr. Moon presented that he had developed a test that was "100 percent fully tested by Johns Hopkins University" with a "95 percent effective rate in detecting breast cancer."[11] Dr. Moon represented that research on the test was complete and that the "product was done, ready for commercialization, going to the FDA, marketing, and sales."[12]

Dr. Moon, meanwhile, testified that he viewed the meeting as an opportunity to present his research and develop a potential relationship, whether or not that ultimately resulted in funding.[13] From Dr. Moon's perspective, he was merely presenting on his two

---

[7] *Id.* at 158:24–159:4 (Moon); *id.* at 341:21–23 (Wey).

[8] *Id.* at 343:9–12 (Wey).

[9] *Id.* at 152:15–153:5 (Moon); *id.* at 342:11–19 (Wey).

[10] *Id.* at 107:1–17 (Raiti); *id.* at 341:21–342:2 (Wey).

[11] *Id.* at 344:4–13 (Wey); *see also id.* at 22:13–22 (Raiti) (testifying that Dr. Moon presented that the test had "a very, very high sensitivity and specificity for the identification of particular genetic mutation that he could link to breast cancer, something like 96 and 97 percent, respectively").

[12] *Id.* at 344:17–23 (Wey); *see also id.* at 22:23–23:4 (Raiti) ("[T]he status of the project was effectively ready for Stage II clinical trials and that once Stage II clinical trials were completed and even potentially before, that it would be relatively easy to obtain FDA 510(k) approval for the -- for what would be the genetic test.").

[13] *Id.* at 238:5–239:2, 318:4–14 (Moon).

3

years of breast cancer biomarker research that he hoped could one day be used to develop a commercially viable breast cancer genetic test kit, though no such kit yet existed.[14]

In what will become a common theme in this decision, Dr. Moon's recall of what happened is not the most reliable one. Dr. Moon was incentivized to paint his research in the rosiest light possible. Wey and Raiti were willing to trust Dr. Moon's assurances.[15] Wey and Raiti did not have the expertise necessary to understand all the science underlying Dr. Moon's presentation,[16] and it does not make sense that they would have conjured the precise testing and "effective rate" percentages from thin air. Wey and Raiti's testimony as to Dr. Moon's representations at this initial meeting are thus more credible.

**B.     NYG Capital Conducts Due Diligence And Signs A Term Sheet.**

Based on Dr. Moon's presentation, Wey decided to get the ball rolling on an investment. In Wey's own words, he was "enamored" with Dr. Moon and his research, and Wey saw a joint venture as an opportunity to help women worldwide.[17] Wey also saw

---

[14] *Id.* at 153:22–156:5 (Moon).

[15] *Id.* at 32:14–15 (Raiti) ("I mean, we relied on Dr. Moon for pretty much everything."); *id.* at 357:14–19 (Wey) ("Q.  Did you rely on the information that Dr. Moon provided to you during these meetings?  A.  Absolutely.  I trusted him immensely.")

[16] *Id.* at 26:16–21 (Raiti) ("I'm not a geneticist.  I'm not a Ph.D biologist.  You tell me, right?  How does this work and what are we looking into?"); *id.* at 358:14–20 (Wey) ("The document and the related data came 100 percent from Dr. Moon and also his assistant, Annie.  Keep in mind we're businesspeople; we are not scientists.").

[17] *Id.* at 357:14–358:6 (Wey).

it as a good business opportunity; he testified that Dr. Moon presented that the project could eventually be worth more than $2 billion.[18]

At trial, Wey characterized NYG Capital's services as business consulting and private equity investing.[19] It is unclear to what extent NYG Capital invested its own funds as opposed to connecting financers to potential investments. Both Wey and Raiti described NYG Capital as a "brand."[20] According to Wey, NYG Capital would act as "an investor or as investor's representative in New York," evaluate potential projects, and then "introduce the project to a particular investor that we may have interest in."[21] Raiti testified that NYG Capital was co-branded with an Asian company called NYGG Asia, and that NYGG Asia often invested in projects recommended by NYG Capital.[22] As a result, much of NYG Capital's efforts were expended in the due diligence stage, and then it would "go to see some of our investor network when the deal becomes real."[23]

In the case of Dr. Moon's research, however, both Wey and Raiti testified that the NYG group was not interested in a direct investment, and so NYG Capital sought to

---

[18] *Id.* at 356:17–24 (Wey).

[19] *Id.* at 340:24–341:4 (Wey).

[20] *Id.* at 12:20–13:3 (Raiti); *id.* at 348:3–6 (Wey).

[21] *Id.* at 348:6–19 (Wey); *see also id.* at 13:4–9 ("They were advisory companies. They did business advisory work. And they also worked with investors in Asia to look at different projects and make investments.").

[22] *Id.* at 12:20–14:2 (Raiti) ("So in part, it was identifying opportunities for the NYGG Asia, so Jim [Baxter] and Ben [Wey] would look for different companies or opportunities in the markets in the U.S. to basically identify for purposes of coordinating with NYGG Asia. And NYGG Asia would make investments or not.").

[23] *Id.* at 348:6–19 (Wey).

connect Dr. Moon to other potential investors.[24]  After the January 2015 presentation, Raiti, and to a lesser extent Wey, worked with Dr. Moon to conduct due diligence.[25]  Over the course of several months, Raiti and Dr. Moon spoke frequently over the phone to hammer out the logistics of developing Dr. Moon's research into a commercially viable testing kit.[26]  Dr. Moon consulted with his personal attorney as to the terms of a potential investment.[27]

On March 26, 2015, the parties entered into an Investment Term Sheet for Definitive Agreement (the "Term Sheet").[28]  The Term Sheet contemplated that Dr. Moon would form Prospect Genetics, Inc. as a Delaware corporation.[29]  Prospect Genetics would wholly own Prospect Research, Inc., an entity that held the venture's intellectual property rights, and Prospect Medical Testing, Inc., which would be the operating entity (all together, "Prospect" or the "Company").[30]  NYG Capital had not yet nailed down investors for the project, so the Term Sheet identified NYG Capital or its assignee as the "Investor."[31]  The Term Sheet committed the Investor to providing a $2 million line of credit to Prospect

---

[24] *Id.* at 17:2–11 (Raiti); *id.* at 348:6–19 (Wey).

[25] *Id.* at 14:9–19 (Raiti); *id.* at 353:1–355:9 (Wey).

[26] *Id.* at 29:6–30:17 (Raiti); *id.* at 159:9–16 (Moon).

[27] *Id.* at 159:11–21 (Moon).

[28] JX-3 ("Term Sheet").

[29] *Id.* at 1.

[30] *Id.*

[31] *Id.*; *see also* Trial Tr. at 348:3–23 (Wey) ("So at the point that this document was entered, we would not have known the specific name or the investors or the amount to be precise because it was still preliminary.").

6

Genetics.[32]  The Term Sheet was conditioned on a later-executed credit agreement.[33]  Dr. Moon signed the Term sheet in his individual capacity, as President and Chairman of Prospect Genetics, and as President of JS Yoon.[34]  Baxter signed on behalf of the Investor.[35]

### C.     The Parties Execute The Transaction Documents.

Raiti and Dr. Moon continued to communicate almost every night and on weekends through the spring of 2015 to flesh out the details of the joint venture.[36]  Dr. Moon testified that he spent over a hundred hours communicating with Raiti about the project.[37]  Wey testified that he met with Dr. Moon at least six times during this period.[38]

At the same time, Wey tried to connect the project to interested investors.  He pitched the investment to Roger Li, Wey's friend and colleague of 20 years, in Beijing after the January 2015 presentation.[39]  Li took an interest, and he formed Promise Easy as a British Virgin Islands registered entity to carry out the investment.[40]  Li was a director of

---

[32] Term Sheet at 1.

[33] *Id.*

[34] *Id.* at 5.

[35] *Id.*

[36] Trial Tr. at 28:5–18 (Raiti); *id.* at 266:7–15 (Moon).

[37] *Id.* at 163:14–165:18 (Moon).

[38] *Id.* at 346:20–347:6 (Wey).

[39] *Id.* at 349:3–8, 384:6–9 (Wey).

[40] *Id.* at 341:5–20, 347:7–17 (Wey).

Promise Easy, and Wey served as Promise Easy's United States representative.[41] In this role, Wey updated Li on developments in diligence.[42]

These months-long negotiations culminated in the execution of a Convertible Note Purchase Agreement on May 29, 2015 (the "NPA").[43] Contemporaneously and pursuant to the NPA, Prospect Genetics issued a $2 million Convertible Promissory Note to Promise Easy (the "Promissory Note").[44] The NPA governed the terms of Promise Easy's investment in Prospect.[45] Dr. Moon signed the NPA as President of Prospect Genetics and JS Yoon.[46] Dr. Moon also signed the NPA individually and in his capacity as the sole stockholder of Forecast Genetics Holding Company, Inc. and Forecast Genetics, Inc., the entities Dr. Moon used to hold his 100% stake in Prospect Genetics.[47] Li signed the NPA on behalf of Promise Easy.[48] Section 9.14 of the NPA requires Dr. Moon, Prospect, and

---

[41] *Id.* at 341:16–20 (Wey).

[42] *Id.* at 364:20–365:7 (Wey).

[43] JX-8 ("NPA").

[44] JX-9 ("Promissory Note").

[45] NPA § 1.1; *see also* Trial Tr. at 349:16–19 (Wey) ("This was the definitive investment agreement between the investor and the investment target.").

[46] NPA at 17–18.

[47] *Id.* at 18–19; *see also* Trial Tr. at 161:2–3 (Moon) ("It was a holding company that was made by my lawyer."). Dr. Moon testified that he did not know the difference between the two Forecast Genetics entities. Moon Dep. Tr. at 209:11–210:18. The entities' separate roles do not alter the outcome here, and this decision refers to Forecast Genetics, Inc. and Forecast Genetics Holding Company, Inc. together as "Forecast Genetics."

[48] NPA at 19.

JS Yoon to indemnify Promise Easy for "any and all claims, damages, losses, liabilities and reasonable expenses" that Promise Easy incurred from a breach of the NPA.[49]

The NPA contains five other provisions relevant to this dispute. First, it sets out the purpose of the funding and defines a timeline for completion. Second, it establishes the method for distributing funds and the conditions constituting default. Third, it requires Dr. Moon to license a particular provisional patent to Prospect. Fourth, it requires Prospect to enter a Consulting Agreement to retain Dr. Moon's services. Fifth, it requires Dr. Moon to execute a Security Agreement to collateralize the NPA. This decision refers to the NPA, the Promissory Note, and the related ancillary documents as the "Transaction Documents."

### 1. The Product Timeline

Section 1.2 of the NPA states that Prospect Genetics shall use the funds from Promise Easy

> to complete clinical and other research and product development of a U.S. Food and Drug Administration (FDA) approved prognostic breast cancer genetic screening test and test kit, based on DNA sequencing and related scientific discoveries and intellectual properties for all stages and aspects of breast cancer detection in high risk patients (the "Test"), together with associated overhead, operational, and administrative costs as each may be approved in advance by the Purchaser (collectively, the "Permitted Uses")[.][50]

---

[49] *Id.* § 9.14.

[50] *Id.* § 1.2.

Section 1.2 also requires that expenditures be "in accordance with the budget and milestones provided in the product timeline attached hereto."[51] This provision refers to the Product Timeline Budget Summary ("Product Timeline"), attached as Exhibit B to the NPA.[52] The Product Timeline represented the culmination of Raiti and Dr. Moon's conversations about the logistics of transforming Dr. Moon's research into a commercially viable product.[53] Dr. Moon, with the help of his assistant Annie John, supplied Raiti with the inputs for the Product Timeline.[54] Raiti took these estimates, and through several iterations, finalized them into the Product Timeline.[55] The Product Timeline indicated that the project could be completed in 18 months at a total cost of $1,986,658.[56]

At trial, the parties hotly contested the Product Timeline's purpose and utility. According to Wey, the investors needed a concrete budget and timeline to provide corresponding funding, and the Product Timeline served that purpose.[57] According to Raiti, all of the timeline and budget milestones came from Dr. Moon, and the final Product

---

[51] *Id.*

[52] JX-10 ("Product Timeline").

[53] Trial Tr. at 28:5–29:5 (Raiti); *id.* at 266:7–15 (Moon).

[54] *Id.* at 26:22–27:4 (Raiti); *id.* at 165:8–21 (Moon); *id.* at 358:12–359:13 (Wey).

[55] *Id.* at 26:22–27:10 (Raiti); *id.* at 169:10–11 (Moon); *see, e.g.,* JX-5 (May 4, 2015 email from Dr. Moon to Raiti incorporating Dr. Moon's edits to Raiti's proposed draft).

[56] Product Timeline at 2.

[57] *See* Trial Tr. at 359:24–360:13 (Wey) ("We never understood that to be estimate. Investors never understood that to be an estimate. We understand this [] process is ironclad in stone. . . . It wasn't a start-up venture. It was a private equity, mature investment to commercialization. That was it. That's why this was part of the [] definitive investment document.").

Timeline was supposed to represent Dr. Moon's best estimates for how the project would proceed.[58] Meanwhile, Dr. Moon testified that he repeatedly told Raiti and his personal attorney that the numbers he supplied for the Product Timeline were unattainable "bare bones" estimates that assumed a best-case scenario without any hiccups.[59]

The evidence supports Wey and Raiti's testimony. Wey testified that Promise Easy was reticent to invest more than $2 million.[60] The Promissory Note's principal amount of $2 million and the NPA's aggregate limit of $2 million reflect that Promise Easy did not anticipate expenses deviating wildly from the Product Timeline.[61] Raiti had no experience in breast cancer biomarker diagnostic research, and he necessarily relied on Dr. Moon's expertise to draft the Product Timeline.[62] The Product Timeline does not list ranges of timing or cost suggesting that the estimates were on the low range, and nowhere does it state that it is a best-case estimate.[63] Dr. Moon admitted this at trial.[64]

---

[58] *Id.* at 29:6–39:19 (Raiti).

[59] *See, e.g., id.* at 180:7–21 (Moon) ("It is a general accepting out of common sense in scientific community that any budget can be bare bones and [] on any biotechnical document, we have to assume that this can be changed any time because . . . we have to sign certain development agreement here, but this is my best guess and the best scenario.").

[60] *Id.* at 352:3–5, 360:20–361:12 (Wey).

[61] Promissory Note at 1; NPA § 1.1.

[62] Trial Tr. at 26:22–27:10 (Raiti).

[63] *See* Product Timeline.

[64] Trial Tr. at 180:2–4 (Moon).

Dr. Moon testified that his personal attorney drafted the Transaction Documents and that he reviewed the documents with his attorney before signing them.[65]  Dr. Moon also copied his personal attorney on emails containing Dr. Moon's revisions to the Product Timeline,[66] and Dr. Moon testified that "everything went to my lawyer" in preparing the Transaction Documents.[67]  In Section 3.11 of the NPA itself, Dr. Moon on behalf of Prospect agreed that the Transaction Documents, plus any information given in connection with those documents, did "not contain any untrue or inaccurate statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in the light of the circumstances under which they were made."[68]

It is hard to infer on these facts that the NPA does not reflect Dr. Moon's representation that the Product Timeline was an attainable estimate of the project's progress.

## 2. Distribution And Default Terms

Section 1.1 of the NPA outlines the scope of Prospect Genetics' line of credit from Promise Easy.  In exchange for the Promissory Note, Promise Easy agreed to issue an initial advance of at least $500,000 (the "Initial Advance").[69]  Thereafter, Prospect Genetics

---

[65] *Id.* at 180:5–181:11, 200:10–22 (Moon).

[66] *See, e.g.,* JX-5.

[67] Trial Tr. at 161:6–9 (Moon).

[68] NPA § 3.11.

[69] *Id.* § 1.1.

could request "Additional Advances," which when aggregated with the Initial Advance could not exceed $2 million.[70]

Section 1.3 provides that Prospect Genetics could request Additional Advances by providing written notice to Promise Easy ten days before the requested disbursement (a "Notice of Drawdown").[71] Dr. Moon had to include details in the Notice of Drawdown that identified the permitted uses of the funds to further testing kit development.[72] If the Notice of Drawdown requested funds "for one or more Permitted Uses and is consistent with the Product Timeline," and Prospect had not breached any of its contractual obligations, then Promise Easy could not unreasonably withhold its approval of the Additional Advance.[73] If Dr. Moon satisfied the requisite conditions for an Additional Advance and Promise Easy denied the request, then Dr. Moon could deliver a notice of default.[74]

### 3. Patent Licensing Agreement

Section 2.3(a) of the NPA required Dr. Moon to contemporaneously execute a Patent License Agreement, attached as Exhibit C to the NPA.[75] The Patent License Agreement granted Prospect Research a license to Dr. Moon's provisional patent for his

---

[70] *Id.*

[71] *Id.* § 1.3.

[72] *Id.*

[73] *Id.*

[74] *Id.*

[75] *Id.* § 2.3(a).

genetic sequencing method, which formed the basis of the breast cancer screening kit.[76] The patent was held by JS Yoon.[77] The Patent License Agreement gave Prospect Research a "non-transferrable, worldwide, royalty-free, perpetual, exclusive right and license to use the Licensed IP Rights in the Field of Use to research, develop, and/or commercialize the Test."[78] The "Licensed IP Rights" included Dr. Moon's provisional patent, any improvements he made thereon, and any additional discoveries or data arising from Dr. Moon's continued research.[79] Dr. Moon could only terminate the Patent License Agreement after providing thirty days' written notice of Prospect Research's material breach of the agreement.[80]

Dr. Moon executed the Patent License Agreement individually and on behalf of JS Yoon.[81]

### 4. Consulting Agreement

Section 2.3(c) of the NPA required that Dr. Moon execute an individual Consulting Agreement for his continued role at Prospect, attached as Exhibit E-1 to the NPA.[82] Dr. Moon's Consulting Agreement defined his services as "all activities, efforts and actions

---

[76] JX-11 ("Patent License Agr.").

[77] Trial Tr. at 166:24–167:2 (Moon).

[78] Patent License Agr. § 2.1

[79] *Id.* § 1.1.

[80] *Id.* § 12.2.

[81] *Id.* at 14; Trial Tr. at 166:24–167:2 (Moon) ("Q. Was the patent filed in your name? A. It was filed under the name of JS Yoon, patent holder. I was inventor.").

[82] NPA § 2.3(c).

necessary and sufficient to complete the items listed in the Product Timeline."[83]  Prospect

paid Dr. Moon $20,000 per month in exchange for his services.[84]  Dr. Moon's Consulting

Agreement automatically terminated after eighteen months.[85]  Dr. Moon testified that he

understood his responsibilities under the Consulting Agreement as providing "all clinical

and scientific items, while Warren Raiti works as details in terms of legal contract or the

details necessary to execute the finance."[86]

### 5. Security Agreement

Section 2.3(b) of the NPA required the parties to execute a Security Agreement,

attached as Exhibit D to the NPA.[87]  Execution of the Security Agreement was a condition

precedent to Promise Easy's disbursement of any funds under the Promissory Note.[88]

Under the Security Agreement, Prospect granted Promise Easy "a security interest in and

to the Collateral (as hereinafter defined) to secure the Loans."[89]  The Security Agreement

defined "Collateral" to include virtually all of Prospect's assets, including machinery,

intellectual property, and trade secrets.[90]  This Collateral secured Dr. Moon and Prospect's

---

[83] JX-58 ("Dr. Moon Consulting Agr.") at 7.

[84] *Id.* § 3.1.

[85] *Id.* § 2.

[86] Trial Tr. at 195:8–13 (Moon).

[87] NPA § 2.3(b).

[88] JX-12 ("Security Agr.") at 1.

[89] *Id.*

[90] *See id.* §§ 2(a)–(l).

obligations under the Transaction Documents.[91]  The Security Agreement also contains an indemnity provision requiring Prospect to indemnify Promise Easy for any damages from breaches of the Security Agreement.[92]  Dr. Moon signed the Security Agreement on behalf of Prospect, and Li signed on behalf of Promise Easy.[93]

### D.  Prospect's First Month

The transaction closed on June 1, 2015, setting the venture in motion.  Dr. Moon, Raiti, Wey, Annie John, and Baxter served as the initial board of directors (the "Board"), with Baxter as chairman.[94]  Dr. Moon was named CEO, and Raiti was appointed CFO.[95]  Promise Easy distributed an Initial Advance of $500,200 into Prospect's bank account on June 10, 2015.[96]

The Product Timeline contemplated that, in the first month of the project, Dr. Moon and Prospect would accomplish milestones in five categories: independent review board ("IRB") sites in Montana and Wyoming; IRB sites through a Contract Research Organization ("CRO"); lab setup; DNA sequencing; and patent application.

First, under the Product Timeline, Dr. Moon was supposed to coordinate with his colleagues to set up three IRB sites in Montana and Wyoming to collect patient samples

---

[91] *Id.* §§ 3(a)–(b).

[92] *Id.* § 14.

[93] *Id.* at 13.

[94] Trial Tr. at 85:20–22 (Raiti); *id.* at 299:4–15 (Moon); *id.* at 362:2–14 (Wey).

[95] *Id.* at 68:21–69:13 (Raiti); *id.* at 335:3–5 (Moon); *id.* at 362:2–14 (Wey).

[96] JX-31 ("Prospect Bank Statement") at 2.

16

for Dr. Moon's research.[97]  IRB sites are physical locations monitored by physicians to oversee research sample collection and ensure compliance with established protocols.[98] Dr. Moon had been in Montana since January 2015, and he remained there through the end of June.[99]  Dr. Moon testified that, during this time, he talked to three physicians about assisting with the IRB sites, though they did not ever reach any formal agreement.[100]

Second, the Product Timeline required Prospect to sign a contract with Total CRO Clinical Trial Management in Dallas, Texas ("Total CRO") to set up six or seven more IRB sites for sample collection.[101]  The Product Timeline estimated that the Total CRO contract would cost $525,000, "all inclusive" of expenses for a comprehensive list of services.[102] Dr. Moon testified that he arrived at this figure based on conversations with a lead doctor at Total CRO, who told Dr. Moon that the project could be completed at that price.[103] According to Raiti, however, when he called Total CRO to implement Dr. Moon's arrangement, Total CRO "didn't have any idea what I was talking about" and told him that

---

[97] Product Timeline at 10.

[98] Trial Tr. at 129:19–130:5 (Raiti) ("IRB sites were basically organizational components where you would be able to oversee the collection of samples. . . .  So whether it's a buccal swab or a blood sample, those were the sites where that would be collected.  And I believe the IRB board, [] were doctors who would oversee that data and, to my understanding, supervise it and make sure that it was conducted in a scientifically defensible way.").

[99] *Id.* at 198:23–199:9 (Moon).

[100] *Id.* at 208:7–210:22 (Moon).

[101] Product Timeline at 8.

[102] *Id.*

[103] Trial Tr. at 248:20–251:7 (Moon).

the "proper price for an ask like the one that I was making was at least twice, if not more, of what we were indicating that they had agreed to."[104] Dr. Moon admitted at trial that that there was no documentation memorializing his purported agreement with Total CRO.[105] Raiti then had to "brutally renegotiate" the Total CRO contract, and the final agreement did not include the full host of services originally promised in the Product Timeline.[106]

Third, the Product Timeline required Prospect to lease a suitable lab space, which required a deep-chill freezer to maintain samples, advanced security to protect the samples, and tracking systems to connect samples to their corresponding patients.[107] Dr. Moon also recommended, and the Product Timeline dictated, that Prospect hire a full-time lab technician.[108] According to the Product Timeline, one of Dr. Moon's colleagues would accept the role at a 20–30% discount.[109] Raiti testified that Dr. Moon had suggested they rent a space in Baltimore from the Abell Foundation, with whom Dr. Moon had a prior relationship.[110] Raiti claimed that Dr. Moon described this lab space as "turnkey," meaning that they "were told by Dr. Moon that the prerequisite operational facilities to accomplish all of these different pieces were in place."[111] When Raiti contacted the Abell Foundation

---

[104] *Id.* at 44:4–45:4 (Raiti).

[105] *Id.* at 321:22–322:3 (Moon).

[106] *Id.* at 45:5–47:14 (Raiti).

[107] Product Timeline at 12; Trial Tr. at 273:6–275:6 (Moon).

[108] Product Timeline at 12; Trial Tr. at 60:9–22 (Raiti).

[109] Product Timeline at 12.

[110] Trial Tr. at 60:9–61:23 (Raiti).

[111] *Id.* at 54:1–10, 64:10–18 (Raiti).

18

to set up the space, however, they told Raiti that this purported arrangement did not exist, and that Dr. Moon owed $8,000 in outstanding fees to the Foundation that Prospect needed to pay before any discussions could move forward.[112]  Even if the fees were paid, the space would still require substantial construction.[113]  Without the lab space, there was no reason to hire the lab technician.[114]  Although Dr. Moon testified that Raiti's expectations for the lab were unrealistic, Dr. Moon was the one who provided the inputs to the Product Timeline.[115]

Fourth, the Product Timeline envisioned that Prospect would contract with AI Biotech within the first month to extract and sequence DNA from Dr. Moon's existing patient samples.[116]  Prospect did execute such a contract with AI Biotech on July 1, 2015,[117] and Raiti testified that the AI Biotech agreement accurately reflected the costs estimated by Dr. Moon in the Product Timeline.[118]

Fifth, the Product Timeline required that Dr. Moon retain counsel to submit a patent application for Dr. Moon's new research.[119]  Dr. Moon testified that he had existing patent

---

[112] *Id.* at 60:9–61:23 (Raiti).

[113] *Id.* at 62:21–64:9 (Raiti).

[114] *Id.* at 60:9–22 (Raiti).

[115] *Id.* at 273:13–275:13 (Moon).

[116] Product Timeline at 3.

[117] JX-15 (AI Biotech Agreement).

[118] Trial Tr. at 34:1–9 (Raiti).

[119] Product Timeline at 14.

counsel for JS Yoon, and that he contacted the same counsel begin work on the new application.[120]

### E. Wey Steps Down From Prospect's Board.

As the project continued, Dr. Moon learned more details about Wey. In 2014, one of Wey's former employees had filed a sexual harassment suit against him.[121] The case gained substantial media attention before it was voluntarily dismissed.[122] Dr. Moon testified that, while he was in Montana, his colleagues raised the allegations against Wey as a potential sticking point for their collaboration.[123] According to Raiti, once Dr. Moon learned about the pending litigation against Wey, Dr. Moon became "obsessed" with the allegations and no longer wanted to cooperate on a project associated with Wey.[124] At trial, Dr. Moon disputed this characterization, but he admitted that the allegations concerned him.[125]

Dr. Moon stirred some of the trouble himself by telling Montana colleagues his misguided belief that Wey was the investor behind Promise Easy, at which point they searched Wey's name and found information on the sexual harassment lawsuit.[126] Dr.

---

[120] Trial Tr. at 194:24–195:3 (Moon).

[121] *Id.* at 372:16–373:9 (Wey).

[122] *Id.* at 375:18–20 (Wey); *see also* JX-23, JX-26, JX-30 (articles reporting on lawsuit).

[123] Trial Tr. at 260:17–261:11 (Moon).

[124] *Id.* at 83:23–84:16 (Raiti).

[125] *Id.* at 303:11–306:1 (Moon).

[126] Trial Tr. at 272:6–23 (Moon); *see id.* at 261:1–11 (Moon) ("[The colleague] asked about who is investor. I said it is [] a Mr. Ben Wey with NYGG. And who are they? So I talked

Moon testified that he misunderstood Wey's early efforts in diligence as predicating an investment by NYG Capital, and Dr. Moon assumed that the venture was funded entirely with Wey's own money.[127]  The NPA did not include any mention of Wey or NYG Capital, however, and none of the Transaction Documents mentioned either party.[128]

Wey resigned from the Board at the end of June 2015.[129]  Wey and Raiti credibly testified that Wey's resignation stemmed both from his desire to focus on the pending litigation and his understanding that, having connected Prospect to funding, his role had been fulfilled.[130]  A June 10, 2015 email from Wey supports the latter narrative—Wey wrote, "[t]his company will now be run by professionals (Dr. Moon being the CEO and Warren Raiti being the CFO)."[131]  Li took Wey's place on the Board.[132]

According to Dr. Moon, this was the first time he learned of Li's existence.[133]  Dr. Moon testified that he continued to believe through trial that Wey personally funded the

---

to him about he is investor located in Wall Street.  And one day he came to me and showed me all of the negative news, and he expressed my concern, saying that this is a very small community and, you know, people all talk with each other.").

[127] *Id.* at 158:8–17, 298:22–299:24 (Moon).

[128] *See, e.g.,* NPA at 1 (listing only Promise Easy Limited as the NPA purchaser); Promissory Note at 1 (listing only Promise Easy Limited as the purchaser of the Promissory Note); Security Agr. at 1 (listing only Promise Easy Limited as the secured party).

[129] Trial Tr. at 114:19–115:5 (Raiti); *id.* at 311:6–12 (Moon); *id.* at 362:15–20 (Wey).

[130] *Id.* at 135:20–136:2 (Raiti); *id.* at 362:2–14 (Wey).

[131] JX-7 at 1.

[132] Trial Tr. at 291:7–15 (Moon).

[133] *Id.* at 300:7–10 (Moon).

21

investment into Prospect.[134] Raiti, however, testified that he repeatedly explained Wey's role to Dr. Moon, and Dr. Moon himself served on the Board with Li, who was connected to the actual investor.[135]

### F. Prospect Fails To Meet Milestones Through The Summer Of 2015.

The venture strained as the months wore on. The main tension concerned the division of labor between Raiti and Dr. Moon.

Raiti testified extensively and credibly about the tireless hours he devoted to getting Prospect off the ground.[136] Raiti felt as though he was performing one hundred percent of Dr. Moon's job "for many months."[137] Raiti was in consistent contact with Total CRO and with the Abell Foundation trying to iron out the details of their contracts with Prospect.[138] Raiti testified that Dr. Moon was hard to reach during this period, and that when Raiti could get Dr. Moon on the phone, Dr. Moon was restless and agitated.[139]

---

[134] *Id.* at 298:16–299:24 (Moon).

[135] *Id.* at 86:4–8 (Raiti) ("Q. [D]id you ever explain to Dr. Moon what Mr. Wey's role was in the transaction or, I guess, more appropriately, what his role wasn't in the transaction? A. Yeah, many times."); *see id.* at 86:14–20 (Raiti) (testifying that he told Dr. Moon, "Ben was not a part of the project. He wasn't on the board. There was no involvement. This certainly came up later as well after the indictment in 2015.").

[136] *Id.* at 76:2–83:2 (Raiti).

[137] *Id.* at 80:21–24 (Raiti); *see also id.* at 73:13–18 (Raiti) ("And so I very much got stuck in the middle trying to develop something with basically an absentee CEO in a field that was -- I mean, to say it's not my expertise is an understatement or a gross understatement. And it was a lot of work.").

[138] *Id.* at 74:2–8, 78:17–22 (Raiti).

[139] *Id.* at 72:14–74:8 (Raiti).

Meanwhile, Dr. Moon testified that he was on a "break" between April and September 2015.[140] According to Dr. Moon, he only worked 20–30% of his normal hours during this period, which he spent at a part-time job on the East coast.[141] Dr. Moon continued to receive his $20,000 monthly compensation pursuant to the Consulting Agreement.[142]

By the end of August, the third month of the project, most of the Product Timeline milestones were unmet. Dr. Moon's Montana and Wyoming IRB sites were supposed to be set up and receiving samples; no such IRB sites had been established, nor would they ever be.[143] Total CRO was supposed to have six or seven functional IRB sites; no such IRB sites existed, nor would they ever, and the protocol for running them had not even been established.[144] The lab was to be operational and running Dr. Moon's proposed study; Prospect had not yet prepared an adequate lab space, and it never retained a lab technician.[145] AI Biotech was supposed to have a completed its genome sequencing report;

---

[140] *Id.* at 212:1–4 (Moon).

[141] *Id.* at 199:6–15, 212:1–11 (Moon).

[142] Prospect Bank Statement at 1–2.

[143] *Compare* Product Timeline at 10, *with* Trial Tr. at 189:20–22 (Moon) ("Q. So you did not set up any IRB sites? A. I did not.").

[144] *Compare* Product Timeline at 8, *with* Trial Tr. at 46:7–48:13 (Raiti) ("[T]hey did not complete the protocol. No independent review board sites were ever set up.").

[145] *Compare* Product Timeline at 12, *with* Trial Tr. at 81:23–82:4 (Raiti) ("And then with regard to the lab, there was equipment and other things that were necessary as the construction project that we had undertaken with that was developing. So in order to take the lab to the next phase, equipment and all of the other materials would have been necessary. But at that point it was a little bit silly because the whole thing was off track.").

according to Dr. Moon, only 80% of that work had been completed.[146] The lone part of the project on track was the patent application, and that was because Dr. Moon's only task for the first seven months was to contact the patent counsel he had already retained for JS Yoon.[147]

### G. Prospect Faces Setbacks In September 2015.

In September 2015, Wey was indicted for securities fraud, wire fraud, and money laundering in connection with reverse merger transactions he executed between Chinese and United States companies.[148] Although the Department of Justice later voluntarily dismissed the charges,[149] these allegations sent Dr. Moon's concerns into overdrive.

According to Raiti, this news prompted Dr. Moon to decide: "I'm not going to work with anything having to do with Ben Wey."[150] Dr. Moon corroborated this narrative, testifying that under his belief that Wey was financing the project, he was "really scared."[151] Raiti testified that Dr. Moon was considering refinancing the Promissory Note through a different source.[152] These refinancing options never came about.[153]

---

[146] *Compare* Product Timeline at 3, *with* Trial Tr. at 271:18–272:5 (Moon).

[147] Product Timeline at 14; Trial Tr. at 194:24–195:3 (Moon).

[148] Trial Tr. at 375:6–17 (Wey); JX-23 (September 10, 2015 article discussing charges).

[149] Trial Tr. at 375:6–17 (Wey).

[150] *Id.* at 89:7–12 (Raiti); *see also id.* at 305:21–24 (Moon) ("I do not want to have a situation working certain project on which money is involved in wire fraud, which is very serious crime, as far as I know.").

[151] *Id.* at 300:23–301:21 (Moon).

[152] *Id.* at 89:13–24 (Raiti).

[153] *Id.* at 90:16–91:24 (Raiti).

Then, on September 11, 2015, Annie John was terminated because "she became a substantial risk to the business."[154]  Prospect paid her a $10,000 termination fee.[155]  Dr. Moon testified that she had become increasingly concerned about working with Wey after the sexual harassment allegations and indictment.[156]

## H.    Promise Easy Denies Prospect's Request For Additional Funds.

It became clear in September through October 2015 that Prospect would soon burn through the entire Initial Advance.[157]  On October 5, 2015, Dr. Moon submitted a Notice of Drawdown to Promise Easy, requesting an Additional Advance of $498,175 pursuant to the NPA.[158]  The requested funds included $60,000 for three months of Dr. Moon's consulting fees, $12,000 to hire Dr. Moon's proposed lab technician, $60,000 to retain patent counsel, and $20,000 for Dr. Moon to contact research institutions to set up IRB sites.[159]  The Notice of Drawdown tied each expense to a line item in the Product Timeline, and $349,425 of the requested expenses related to milestones that were supposed to be completed in the project's first four months.[160]  By this time, the project was in its fifth month.

---

[154] JX-33 at 6.

[155] *Id.*

[156] Trial Tr. at 296:13–298:5 (Moon).

[157] *Id.* at 81:6–18 (Raiti); *id.* at 202:2–15 (Moon).

[158] JX-32 ("Notice of Drawdown").

[159] *Id.* at 1–2.

[160] *Id.*

On October 5, Li emailed Baxter, Dr. Moon, and Raiti questions concerning the Notice of Drawdown.[161] On October 9, Baxter emailed Li a memorandum addressing Li's concerns.[162] The memo stated that "Prospect Genetics, Inc. has made moderate but encouraging progress since it was funded in May, 2015."[163] As support, the memo stated that Total CRO had "completed a clinical trial protocol," a prerequisite to opening the IRB sites.[164] This was only partially true. While Total CRO had completed a draft protocol, it had not been finalized, and Total CRO never ultimately provided a finalized protocol.[165] The memo acknowledged that no IRB sites had been established, which it blamed on "concerns over the recent media coverage regarding Benjamin Wey."[166] The memo acknowledged that the AI Biotech progress was not up to speed, that the lab space was not ready, and that Annie John had been terminated.[167] The memo concluded: "In sum, it is likely that the project will be delayed by 3–5 months. The ability of Prospect to remain on

---

[161] Though Li's email is referenced in the trial record, it was not submitted by the parties as a joint exhibit. *See* JX-33 (October 9, 2015 email from Baxter to Li stating, "Attached is a memo from Prospect Genetics, Inc. responding to your questions and comments and request for information in your October 5 email.") ("Oct. 9, 2015 Email").

[162] *Id.*

[163] *Id.* at 3.

[164] *Id.*

[165] Trial Tr. at 47:15–19 (Raiti); *id.* at 189:1–7 (Moon) ("[Total CRO] did provide the draft protocol, but that is not enough to go to IRB and open the site. They want to see the final protocol.").

[166] Oct. 9, 2015 Email at 5.

[167] *Id.* at 5–6.

budget for each aspect of the project going forward is unknown with respect to those Product milestones that have not been reached or fully tested."[168]

In the cover email to the memo, Baxter noted that Li was considering suing Prospect.[169] Baxter wrote, "I think that would be the worst thing that could be done from the standpoint of you [Li], Ben and Prospect."[170]

The parties dispute who led Promise Easy's response to the Notice of Drawdown. The NPA required Raiti as CFO to sign off on Dr. Moon's request.[171] Raiti testified that he intended to approve the request, but that Baxter and Wey encouraged him to stop the project from "bleeding money."[172] Dr. Moon testified that Baxter was the one who drafted the Notice of Drawdown and led the charge in getting Prospect more funding.[173] Based on Baxter's contemporaneous memo and email to Li defending the Additional Advance, Dr. Moon's narrative is more plausible. It seems likely that Raiti faced pressure from Wey and Li to avoid doling out more of Promise Easy's money. Raiti admitted at trial that he was worried about exposure to personal liability if Promise Easy sued Prospect.[174] It makes sense that Raiti would try to appease Wey and Li in the interim to avoid that outcome.

---

[168] *Id.* at 6.

[169] *Id.* at 2.

[170] *Id.*

[171] NPA § 1.3 ("Each Notice of Drawdown shall be . . . signed by the Chief Financial Officer ('CFO') of the Company and by Dr. Moon.").

[172] Trial Tr. at 88:1–14 (Raiti).

[173] *Id.* at 216:11–217:6 (Moon).

[174] *Id.* at 123:8–20 (Raiti).

Irrespective of motivations, Raiti did not approve the requested funds in the Notice of Drawdown.[175]  Shortly thereafter, in mid-October 2015, Raiti resigned as CFO.[176] Baxter filled his role.[177]  When Promise Easy failed to disburse the Additional Advance requested in the Notice of Drawdown, Prospect sent a Notice of Purchaser Default on October 30, 2015.[178]  Baxter executed the document as CFO.[179]

## I.        Promise Easy Notices Breach.

Raiti continued to serve as a director and COO of Prospect after he stepped down as CFO.[180]  Raiti focused on finding new financers for the project so that Promise Easy could walk away.[181]  After failing to do so, Raiti formally left Prospect in February 2016.[182]

Meanwhile, on November 9, 2015, Dr. Moon refiled the provisional patent covered by the Patent License Agreement in his own name, rather than under JS Yoon.[183]

---

[175] *Id.* at 121:12–21 (Raiti).

[176] *Id.* at 114:11–15 (Raiti).

[177] *Id.* at 121:3–5 (Raiti).

[178] JX-37 ("Notice of Purchaser Default").

[179] *Id.*

[180] *See* JX-38 at 1 (November 18, 2015 email from Raiti signing off as "Chief Operating Officer, Director").

[181] *See* JX-39 (texts between Raiti and Dr. Moon's personal attorney discussing meetings with potential financers).

[182] Trial Tr. at 76:8–12 (Raiti).

[183] *Id.* at 333:14–20 (Moon).

On May 3, 2016, Promise Easy delivered notice to Prospect that it was in current and ongoing breach of the NPA.[184] Promise Easy claimed that Prospect was in breach of three major provisions.[185] First, Promise Easy claimed that Prospect had made "untrue and inaccurate statements of material fact in the Product Timeline" in breach of the representations and warranties provision in Section 3.11 of the NPA.[186] Second, Promise Easy claimed that Prospect had failed to enforce Dr. Moon's obligations under the Consulting Agreement as required by Section 5.1(g) of the NPA.[187] Third, Promise Easy stated that Prospect had improperly transferred the provisional patent in violation of the Patent License Agreement and in violation of Section 5.1(b) of the NPA.[188]

---

[184] JX-41 ("Notice of Breach").

[185] The Notice of Breach also states that Prospect has breached by failing to "obtain key man life insurance Dr. Moon within 30 days of Closing in Violation Section 5.11 of the Agreement[]." *See id.* Promise Easy did not raise this breach as a basis for liability in post-trial briefing.

[186] *Id.*; *see also* NPA § 3.11 ("[T]his Agreement (including all schedules and exhibits hereto), together with all other information provided by any of the Prospect Group to the Purchaser in connection with the transactions contemplated hereby and by any other Transaction Document does not contain any untrue or inaccurate statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not misleading in the light of the circumstances under which they were made[.]").

[187] Notice of Breach; *see also* NPA § 5.1(g) (prohibiting Prospect from taking actions to "[a]mend, waive or modify any term of the Patent License Agreement [or] any of the Transaction Documents" without Promise Easy's consent).

[188] Notice of Breach; *see also* NPA § 5.1(b) (prohibiting Prospect from taking actions to "[c]onvey, sell, lease, transfer or otherwise dispose of (collectively, 'Transfer'), any material part of its or its subsidiaries' business or property (including intellectual property), other than Transfers in the ordinary course of business" without Promise Easy's consent).

### J.  This Litigation

Promise Easy filed the Complaint in this action on June 9, 2016, against Dr. Moon,

JS Yoon, Forecast Genetics, and the Prospect entities (collectively, "Defendants").[189]  The

Complaint asserts five counts:

- In Count I, Promise Easy alleges that Dr. Moon, Forecast Genetics, and Prospect Genetics violated the Delaware Securities Act by misrepresenting the Product Timeline, which induced Promise Easy to enter the NPA.

- In Count II, Promise Easy seeks a declaratory judgment that Dr. Moon, JS Yoon, and Prospect breached the Transaction Documents, that they must indemnify Promise Easy for the Initial Advance and any losses incurred thereafter, and that Prospect Research must assign Promise Easy its rights under the Patent License Agreement.

- In Count III, Promise Easy alleges that Dr. Moon breached his Consulting Agreement.

- In Count IV, Promise Easy alleges that Dr. Moon and Prospect breached the implied covenant of good faith and fair dealing by demanding the Additional Advance in bad faith.

- In Count V, Promise Easy alleges fraudulent inducement against Dr. Moon for materially representing the inputs to the Product Timeline.

Promise Easy sought declaratory relief, rescissory damages, actual and compensatory

damages, and attorneys' fees and expenses.

In their Answer and Counterclaim, Defendants asserted a single count for breach of

the NPA against Promise Easy for failing to provide the Additional Advance requested in

the Notice of Drawdown.[190]

---

[189] Dkt. 1.

[190] Dkt. 13.

30

The parties forewent dispositive motion practice and participated by Zoom in a two-day trial on March 29 and 30, 2021.[191]  Post-trial briefing proceeded in fits and starts as the parties repeatedly attempted to resolve their dispute without this court's intervention.  The parties entered six different post-trial briefing scheduling orders before ultimately asking that this court hold the deadlines in abeyance pending settlement discussions on January 26, 2022.[192]  After these efforts failed, the parties started back up again by filing a new scheduling order in August 2022, then filed six amended scheduling orders so that the parties could continue settlement negotiations.[193]  Ultimately, the parties filed their opening post-trial briefs in December 2022 and concluded the process in January 2023.[194]  By then, Defendants had agreed to drop their counterclaim.[195]  The court heard post-trial oral argument on June 5, 2023.[196]

---

[191] Dkts. 90–91.

[192] Dkts. 92, 94, 96, 98, 100, 102, 103.

[193] Dkts. 106, 108, 110, 112, 114, 116, 118, 119, 120, 122.

[194] Dkt. 123 ("Pl.'s Opening Post-Trial Br."); Dkt. 124 ("Defs.' Opening Post-Trial Br."); Dkt. 126 (Pl.'s Answering Post-Trial Br.); Dkt. 127 ("Defs.' Answering Post-Trial Br.").

[195] Defs.' Answering Post-Trial Br. at 1 n.2.

[196] Dkt. 131 (June 5, 2023 Hr'g Tr.).

## II. LEGAL ANALYSIS

This legal analysis proceeds in five parts, addressing each count from the Complaint in order. In each claim, Promise Easy bears the burden of proving its claims by a preponderance of the evidence.[197]

### A. Promise Easy Proved A Violation Of The Delaware Securities Act.

In Count I, Promise Easy claims that Dr. Moon, Forecast Genetics, and Prospect Genetics violated the Delaware Securities Act through misrepresentations in the Product Timeline that induced Promise Easy to purchase the Promissory Note.[198]

The Delaware Securities Act authorizes a private cause of action for the purchaser of a security against the seller if the seller makes an untrue statement or omission regarding the security.[199] The buyer can sue to recoup the principal amount on the security, plus

---

[197] *See S'holder Representative Servs. LLC v. Gilead Scis., Inc.*, 2017 WL 1015621, at *15 (Del. Ch. Mar. 15, 2017) ("To succeed at trial, Plaintiffs, as well as Counterclaim-Plaintiffs, have the burden of proving each element . . . of each of their causes of action against each Defendant or Counterclaim-Defendant, as the case may be, by a preponderance of the evidence." (internal quotation marks omitted)).

[198] The Promissory Note is governed by the laws of Delaware. *See* JX-9 § 12.

[199] *See* 6 *Del. C.* § 73-605(a)(2) ("Any person who: . . . . Offers . . . a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they are made, not misleading (the buyer . . . not knowing of the untruth or omission), and who does not sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known of the untruth or omission, is liable to the person buying . . . the security from . . . him or her, who may sue either at law or in equity to recover the consideration paid for the security, together with the interest at the legal rate from the date of payment costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon the tender of the security, or for damages if he or she no longer owns the security.").

interest and attorneys' fees.[200]   The Delaware Securities Act defines the unlawful act as making "any untrue statement of a material fact or [] omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading" in connection with the sale of a covered security.[201]

Defendants respond to Count I in two ways.  They first contend that the Promissory Note does not constitute a "security" within the purview of the Delaware Securities Act. They next contend that Promise Easy has failed to carry its burden of proving a violation of the Act.

### 1. The Promissory Note Was A "Security" Under The Delaware Securities Act.

The Delaware Securities Act defines a covered "security" to include "any note," "unless the context otherwise requires."[202]   In determining whether a note is a security, Delaware courts apply the test established by the United States Supreme Court in *Reves v. Ernst & Young*.[203]   Under *Reves*, calling an instrument a "note" creates a rebuttable presumption that it is a qualifying security.[204]   Once this presumption applies, the seller bears the burden of proving that the note was not a qualifying security.[205]

---

[200] *Id.*

[202] *Id.* § 73-103(a)(23).

[203] 494 U.S. 56 (1990); *see also Boo'ze v. State*, 846 A.2d 237, 2004 WL 691903, at *1 (Del. Mar. 25, 2004) (TABLE) (adopting *Reves* standard).

[204] *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2012 WL 1883040, at *8 (Del. Ch. May 23, 2012).

[205] *Id.*

33

The presumption can be rebutted in two ways. First, a seller can demonstrate that a note is not a security if it falls into a judicially crafted list of instruments that are "not properly viewed as securities":

> (1) a note delivered in consumer financing, (2) a note secured by a mortgage on a home, (3) a short-term note secured by a lien on a small business or some of its assets, (4) a note evidencing a character loan to a bank customer, (5) a short-term note secured by an assignment of accounts receivable, (6) a note which simply formalizes an open-account debt incurred in the ordinary course of business and (7) notes evidencing loans by commercial banks for current operations.[206]

Second, even if a note does not fall within one of the seven enumerated categories above, "if, after engaging in a multi-factor test, the note bears a 'family resemblance' to one of the instruments on the list, then it is not a security."[207] The "family resemblance" analysis requires comparing the note to the seven enumerated categories along four factors:

> (1) the motivations of the parties to enter into the note (whether they were for investment purposes); (2) the note's plan of distribution (whether it was for common trading); (3) the reasonable expectations of the investing public (that such was an investment); and (4) whether there is other non-Securities Act protection available to the alleged victims.[208]

---

[206] *Id.*

[207] *Verizon Commc'ns Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 2021 WL 710816, at *8 (Del. Super. Feb. 21, 2021) (citing *Reves*, 494 U.S. at 65; *Boo'ze*, 846 A.2d 237, at *2–3).

[208] *State v. Attarian*, 2014 WL 4782859, at *2 (Del. Super. Sept. 8, 2014).

"No one factor is dispositive as they are considered as a whole," and the test "necessarily becomes highly individualized to the facts of the particular case."[209]

The Promissory Note states that it is a "10% Convertible Promissory Note."[210] This creates a rebuttable presumption that the Promissory Note is a covered security. Defendants do not contend that the Promissory Note falls within any of the seven enumerated categories under *Reves*.[211] This leaves the "family resemblance" factors as Defendants' only option to show that the Promissory Note is not a covered security. None of these factors supports Defendants' position.

Under the first factor, the trial record supports a finding that Dr. Moon, Prospect, and Promise Easy's motivations were to create an investment. Defendants argue that Wey's personal interest in breast cancer research and desire to work with Dr. Moon imply that the funding was primarily a commercial loan. To the contrary, Promise Easy had demonstrable profit motives behind its funding—Wey testified that Dr. Moon presented that the project could eventually be worth more than $2 billion.[212] This fact also weighs in Promise Easy's favor on the third factor, as Promise Easy's reasonable expectation was that it would reap a profit from funding Dr. Moon's research.

---

[209] *Fletcher*, 2012 WL 1883040, at *9 (citing Thomas Lee Hazan, *The Law of Securities Regulation* § 1.6(14) (4th ed. 2002)).

[210] Promissory Note at 1.

[211] *See* Defs.' Opening Post-Trial Br. at 28–30.

[212] Trial Tr. at 356:17–24 (Wey).

The second and fourth factors further support this conclusion. As to the second factor, Defendants argue that the fact that the Promissory Note was never transferred is evidence that it was not freely transferable. Though Defendants are factually correct that the note was never transferred, nothing in the Promissory Note prohibited Promise Easy from transferring it to third parties, and in fact Dr. Moon sought other financers to purchase Promise Easy's obligation. Under the fourth factor, while the Security Agreement may have initially provided some extra-statutory protection through collateralization, as discussed below, Dr. Moon's refiling of the patents in his own name threatened that collateral.

In sum, Defendants have failed to rebut the presumption that the Promissory Note was a security covered by the Delaware Securities Act.

### 2. Promise Easy Proved The Elements Of Its Delaware Securities Act Claim.

To show that a defendant violated Section 73-201(2) of the Delaware Securities Act, a plaintiff must prove that the defendant: "(1) made a misstatement or omission (2) of material fact (3) with scienter (4) in connection with a purchase or sale of a security (5) upon which the plaintiff . . . relied and (6) that reliance proximately caused the plaintiff's (or other person's) injury."[213]

---

[213] *Hubbard v. Hibbard Brown & Co.*, 633 A.2d 345, 349 (Del. 1993); *see also XComp, Inc. v. Ropp*, 2002 WL 1753168, at *5 (Del. Ch. July 19, 2002) (listing same elements); *Van Roy v. Sakhr Software Co.*, 2014 WL 3367275, at *3 (Del. Ch. July 8, 2014) (listing same elements).

Promise Easy proved factors (1), (2), (4), (5), and (6). The Product Timeline formed the basis of the parties' obligations in the NPA, and Dr. Moon testified that these goals were never actually achievable. These misstatements, or the omission of Dr. Moon's characterization as "bare bones," were material because the Product Timeline drove every obligation in the NPA: how to measure Dr. Moon's performance; when Promise Easy had to make distributions; and when Dr. Moon could notice default. As found above, the Promissory Note and NPA fall within the statutory definition of the "sale of a security." And as to reliance, the Product Timeline was the method of communicating expectations of the investment to Promise Easy, and Promise Easy naturally relied on those expectations. Promise Easy's reliance on Dr. Moon's misrepresentations proximately caused it to enter into the failed investment. Defendants' argument to the contrary, that Wey's indictment doomed the project, is specious: Dr. Moon failed to meet any of the milestones in the Product Timeline, even those unrelated to relationships allegedly harmed by the allegations against Wey.

The remaining element, scienter, requires closer examination. In interpreting the "antifraud" provisions of the Delaware Securities Act, the Delaware Supreme Court has noted that they are virtually identical to the antifraud provisions in SEC Rule 10b-5.[214] As a result, state and federal courts in Delaware have applied a "knowingly" standard to claims

---

[214] *See Hubbard*, 633 A.2d at 349 ("Thus, both federal and state antifraud provisions share the goal of protecting investors by preventing deception.").

under the Delaware Securities Act.[215] Since the statute targets deception, it makes sense to apply the same mental state standard to the antifraud provision as common law fraud: "a misrepresentation must be made either knowingly, intentionally, or with reckless indifference to the truth."[216]

The civil remedial provision of the Delaware Securities Act, Section 73-605, flips the burden of proof, imposing liability where a seller defendant "does not sustain the burden of proof that the [seller] did not know, and in the exercise of reasonable care could not have known of the untruth or omission."[217] This court has interpreted an identical Pennsylvania state antifraud provision to mean that a plaintiff need not plead scienter, but that the plaintiff risks not recovering if the defendant can meet its burden of showing that it exercised reasonable care.[218] In this case, it is a distinction without a difference: Promise Easy has proven that Dr. Moon, acting on behalf of Prospect, knowingly misrepresented the Product Timeline inputs, which negates a finding that he did not know of their falsity despite exercising reasonable care.

---

[215] *See XComp*, 2002 WL 1753168, at *2 (describing findings of the Securities Commissioner of the State of Delaware that individual had violated the Delaware Securities Act by making "knowingly false" statements); *Van Roy*, 2014 WL 3367275, at *5 (applying Delaware common law fraud analysis to dismiss Delaware Securities Act claims).

[216] *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 143 (Del. Ch. 2004).

[217] 6 *Del. C.* § 73-605(a)(2).

[218] *Kronenberg v. Katz*, 872 A.2d 568, 599–600 (Del. Ch. 2004).

Both direct and circumstantial evidence support this outcome. Dr. Moon testified that he knew that the project could feasibly take up to 36 months or more to complete,[219] that a $2 million budget was "too tight,"[220] and that the Total CRO contract could cost up to $1 million.[221] Dr. Moon supplied the inputs and ultimately signed the Transaction Documents stating that the project could be completed in 18 months, within a $2 million budget, based on an agreement with Total CRO to perform its services for $525,000. Promise Easy has proven that Dr. Moon knew these statements to be false when he made them.

The surrounding circumstances and incentives further support this finding. Raiti, Wey, and others on the investment side relied on Dr. Moon's specialized expertise to create the Product Timeline. It would not make sense for Promise Easy to agree to invest a maximum of $2 million under the Promissory Note, while knowing that the project could far exceed that estimate. Meanwhile, Dr. Moon needed funding to continue his research and to supplement his part-time working income. Dr. Moon had an incentive to sugarcoat the likely timeline and costs to encourage Promise Easy to make its investment. Once the checks were signed, Dr. Moon went on a "break," and he never completed any of the tasks in the Product Timeline. Promise Easy has proven that Dr. Moon knowingly misrepresented the Product Timeline to induce Promise Easy to invest.

---

[219] Trial Tr. at 165:17–21 (Moon).

[220] *Id.* at 168:2–16 (Moon).

[221] *Id.* at 176:14–18 (Moon).

Promise Easy has thus proven a violation of the Delaware Securities Act. Under Section 73-605(a)(2), Prospect Genetics is liable for this violation as the seller of the Promissory Note.[222] Section 73-605(b) imposes joint and several liability on "[e]very person who directly or indirectly controls a seller or buyer liable under subsection (a)."[223] Dr. Moon, through his controlled entities (Forecast Genetics), held 100% of Promise Easy's outstanding shares. Prospect Genetics, Dr. Moon, and Forecast Genetics are thus jointly and severally liable for the award of damages under the Delaware Securities Act, which allows Promise Easy to "recover the consideration paid for the security, together with the interest at the legal rate from the date of payment costs, and reasonable attorneys' fees."[224] Promise Easy represented that the sum of its $500,200 principal payment, interest, costs, and attorneys' fees was $715,911.25 by the time of post-trial briefing.[225] Counsel shall submit an updated form of order and affidavit reflecting its final calculation for this court's approval.

## B. Promise Easy Is Entitled To Declaratory Relief.

In Count II, Promise Easy seeks a declaratory judgment that Defendants breached the Transaction Documents. Typically, the party seeking to enforce a contract must prove

---

[222] *See* 6 *Del. C.* § 73-605(a)(2).

[223] *Id.* § 73-605(b).

[224] *Id.* § 73-605(a)(2).

[225] Pl.'s Opening Post-Trial Br. at 33.

each element of its breach of contract claim by a preponderance of the evidence.[226] "Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to plaintiff."[227]

Promise Easy contends that Defendants violated myriad provisions in the Transaction Documents. Promise Easy seeks to enforce its right to indemnification for all of its losses related to Defendants' breaches under Section 9.14 of the NPA. Promise Easy also seeks to enforce its right to have the patents reassigned in a manner consistent with the Patent License Agreement.

Defendants raise two arguments in response: that the count for declaratory relief is duplicative of Promise Easy's contract claims, and that any breach was excused under the frustration of purpose doctrine due to Wey and Raiti's conduct.

First, Defendants say that Promise Easy's requested declaratory judgment is entirely duplicative of its contract claims in Counts III and IV, discussed in more detail below. This position oversimplifies Promise Easy's requested relief in the declaratory judgment. The declaratory judgment seeks separate relief than the other counts. A finding of breach of the NPA expands Promise Easy's potential recovery to include JS Yoon under Section 9.14. The requested declaratory judgment also would require Defendants to indemnify Promise Easy for all related losses. Finally, the requested declaratory judgment requires

---

[226] *See Dermatology Assocs. of San Antonio v. Oliver St. Dermatology Mgmt. LLC*, 2020 WL 4581674, at *19 n.214 (Del. Ch. Aug. 10, 2020).

[227] *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

41

Dr. Moon to reassign the patents consistent with the Patent License Agreement. In other words, the declaratory judgment is necessary to wholly resolve the dispute between the parties of this case and avoid future litigation.

Defendants argue in a single conclusory sentence that there is "no evidence that Dr. Moon breached the NPA or other Transaction Documents."[228] This decision resolves the claims in a similarly summary fashion.

Under the Patent Licensing Agreement, Dr. Moon and JS Yoon granted an indefinite license of the provisional patent to Prospect Genetics, with Promise Easy as a third-party beneficiary. The document explicitly references the provisional patent that was then held by JS Yoon. By refiling the patent in his own name, Dr. Moon effectively and unilaterally withdrew the licensed patent from the agreement. Dr. Moon does not allege that any of the conditions justifying termination were met in this instance, and thus terminating the applicable patent was a breach.

In Section 3.11 of the NPA, Defendants agreed that all information in the NPA and its exhibits was not false or materially misleading. Defendants, through Dr. Moon, made misleading statements as to the feasibility of the Product Timeline in breach of Section 3.11.

In Section 5.1(g) of the NPA, Prospect covenanted not to "[a]mend, waive or modify any term" of the Transaction Documents.[229] By condoning Dr. Moon's failure to complete

---

[228] Defs.' Opening Post-Trial Br. at 53.

[229] NPA § 5.1(g).

milestones in the Product Timeline, Prospect effectively waived or modified Dr. Moon's obligations under the Consulting Agreement in breach of Section 5.1(g).

In other words, Promise Easy is entitled to a declaratory judgment that Defendants breached the Transaction Documents.

Second, Defendants contend that any breach is excused under the frustration of purpose doctrine. Defendants' argument on this point was also raised in a single sentence in their post-trial opening brief.[230] This argument is unconvincing, particularly as to actions that were entirely within Dr. Moon's own control, like reassigning the patents.

Summing it up, Promise Easy is entitled to its proposed declaratory judgment, with the caveat that Promise Easy cannot collect a double recovery for the same conduct. But to the extent that the declaratory judgment encompasses relief with a greater scope than that already awarded, Promise Easy is entitled to that relief.

### C. Promise Easy Proved That Dr. Moon Breached The Consulting Agreement.

In Count III, Promise Easy claims that Dr. Moon breached the Consulting Agreement. The legal standard for breach of contract applied to Count II also applies to Count III.

Section 1 of the Consulting Agreement requires Dr. Moon to complete:

> [A]ll efforts, actions and activities necessary and sufficient to complete the development and commercialization of the Test as defined in the Convertible Note Purchase Agreement and all

---

[230] Defs.' Opening Post-Trial Br. at 53 ("And even if the Court finds that a breach occurred, it should also find that the breach was excused under the doctrine of frustration of purpose because Plaintiff's own agents frustrated the purpose of the Transaction Documents.").

attachments and exhibits thereto, which are incorporated herein by reference. Such services include, but are not limited to, all activities, efforts and actions necessary and sufficient to complete the items listed in the Product Timeline.[231]

Promise Easy contends that Dr. Moon took his compensation under the Consulting Agreement without performing any of the required services.

As this decision has already discussed, Dr. Moon did not definitively complete any tasks within the Product Timeline. In fact, Dr. Moon testified that he was on a "break" for the first four months of the project. Meanwhile, Dr. Moon continued to receive his full $20,000 monthly compensation under the Consulting Agreement. By failing to do "all activities, efforts and actions necessary and sufficient to complete the items listed in the Product Timeline," Dr. Moon breached the Consulting Agreement.

Defendants argue that any breach should be excused because Promise Easy and its agents frustrated the Transaction Documents' purpose by denying Dr. Moon's request for an Additional Advance. The frustration of purpose doctrine applies when: "(1) there is substantial frustration of the principal purpose of the contract; (2) the parties assumed that the frustrating event would not occur; and (3) the [d]efendant is not at fault."[232] "In all the cases holding that the promisor was discharged from duty by impossibility of performance or frustration of purpose, it has been assumed that the promisor was not himself the

[231] Consulting Agr. § 1.

[232] *Level 4 Yoga, LLC v. CorePower Yoga, LLC*, 2022 WL 601862, at *26 (Del. Ch. Mar. 1, 2022) (quoting *CRS Proppants LLC v. Preferred Resin Hldg. Co., LLC*, 2016 6094167, at *7 (Del. Super. Sept. 27, 2016)).

responsible cause of the impossibility or frustration."[233]  Frustration of purpose is "very difficult to invoke," and Delaware courts are "extremely reluctant to allow parties to disavow obligations that they have agreed to."[234]

Defendants did not brief the elements of frustration of purpose.  Regardless, they have failed to demonstrate that Dr. Moon was not at fault for Promise Easy's refusal to disburse funds.  The trial record shows that Promise Easy denied the Additional Advance after Dr. Moon was unable to meet any of the contemplated deadlines in the first months of the project.  Defendants cannot now invoke the doctrine after stoking the fire themselves.

Promise Easy has proven that Dr. Moon breached the Consulting Agreement.

**D.**     **Promise Easy Failed To Prove That Dr. Moon Breached The Implied Covenant Of Good Faith And Fair Dealing.**

Promise Easy argues that Dr. Moon's demand of the Additional Advance, while he simultaneously planned to terminate the project, was taken in bad faith.  Under Promise Easy's theory, the Notice of Drawdown was pretextual so that Dr. Moon could deliver a notice of default and prevent Promise Easy from exercising its conversion right under the NPA.

The implied covenant of good faith and fair dealing requires that a party vested with discretion under a contract exercise its discretion reasonably, in good faith, and not in an unreasonable or arbitrary way that would destroy the counterparty's right to receive the

---

[233] *Martin v. Star Publishing Co.*, 126 A.2d 238, 242–43 (Del. 1956).

[234] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 2005 WL 5757652, at *6 (Del. Ch. July 27, 2005).

45

fruits and benefits which they reasonably expected to receive under the contract.[235] The implied covenant cannot be invoked to override the express terms of the contract.[236] Moreover, rather than constituting a free floating duty imposed on a contracting party, the implied covenant can only be used conservatively "to ensure the parties' 'reasonable expectations' are fulfilled."[237] The implied covenant is a limited remedy.[238] Its application is a "cautious enterprise."[239]

Section 1.3 of the NPA provides that Prospect Genetics can request Additional Advances "at any time."[240] While Promise Easy alleges that Dr. Moon should have known that the request would not be granted, the only requirement to make a request under the NPA is that the Additional Advance be requested "for one or more Permitted Uses" and be "consistent with the Product Timeline."[241] Further, some of Dr. Moon's most credible testimony suggested that it was Baxter's idea to submit a request for an Additional Advance

---

[235] *See, e.g., Miller v. HCP Trumpet Invs., LLC*, 194 A.3d 908, 2018 WL 4600818, at *1 (Del. 2018) (TABLE), *reargument denied* (Oct. 9, 2018) (noting that "the mere vesting of 'sole discretion'" does not relieve a party of its "obligation to use that discretion consistently with the implied covenant of good faith and fair dealing").

[236] *Dave Greytak Enters., Inc. v. Mazda Motors of Am., Inc.*, 622 A.2d 14, 23 (Del. Ch. 1992) ("[W]here the subject at issue is expressly covered by the contract, or where the contract is intentionally silent as to that subject, the implied duty to perform in good faith does not come into play.").

[237] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005).

[238] *Id.* at 441.

[239] *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010).

[240] NPA § 1.3.

[241] *Id.*

to keep the project alive.  Promise Easy failed to show that the request was so unrelated to legitimate needs of the project as to violate the implied covenant of good faith and fair dealing.

## E.    Promise Easy Proved Fraudulent Inducement.

Under Delaware law, the elements for fraudulent inducement are:

> (1) [T]hat a defendant made a false representation, usually one of fact; (2) with the knowledge or belief that the representation was false, or with reckless indifference to the truth; (3) with an intent to induce the plaintiff to act or refrain from acting; (4) that plaintiff's action or inaction was taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of her reliance on the representation.[242]

This exercise mirrors the Delaware Securities Act analysis above.  Dr. Moon provided the false inputs behind the Product Timeline while knowing that the estimates were unattainable.  Dr. Moon made the misrepresentations to induce Promise Easy to provide funding, which Promise Easy did in justifiable reliance on Dr. Moon's expertise in the field.  Promise Easy has proven that it was damaged by its investment, which it still has not recovered.

Promise Easy has proven its claim for fraudulent inducement.

## F.    Available Remedies

Promise Easy is entitled to compensatory damages, including return of the Initial Advance, interest, costs, and attorneys' fees.  Promise Easy is also entitled to declaratory relief as discussed herein, including enforcing its right to indemnification under the NPA.

---

[242] *In re Swervepay Acq., LLC*, 2022 WL 3701723, at *6 (Del. Ch. Aug. 26, 2022).

Promise Easy is not entitled to rescissory damages as an equitable remedy because they have failed to show that compensatory and declaratory relief do not provide them an adequate remedy at law.

## III.  CONCLUSION

Judgment is entered in favor of Promise Easy as to Counts I, II, III, and V of the Complaint.  Judgment is entered in favor of Defendants as to Count IV of the Complaint. Counsel shall submit a form of order implementing this decision within ten business days after its publication.